Michael S. **GRIFFIN**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–7419.

Court of Appeals of Alaska.

Oct. 6, 2000.

---

John C. Pharr, Anchorage, for Appellant.

William L. Estelle, Assistant District Attorney, Roman J. Kalytiak, District Attorney, Palmer, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Michael S. Griffin, a defendant with a long history of burglaries and thefts, was convicted of a number of class B and class C felonies arising from two separate criminal episodes in June and July, 1998. For these 1998 crimes, Superior Court Judge Eric Smith sentenced Griffin to a composite term of 17 years to serve. In addition, Judge Smith revoked Griffin's suspended jail time from two prior felony cases. All told, Griffin received a composite sentence of close to 23 years' imprisonment. The question is whether this sentence is excessive. For the reasons explained here, we conclude that Griffin's sentence is not clearly mistaken—that it is "within [the] permissible range of reasonable sentences which a reviewing court, after an independent review of the record, will not

modify." [1] Accordingly, we affirm the superior court's sentencing decision.

### Griffin's past criminal history

Griffin has been in trouble with the law on a regular basis for the past fifteen years. In 1984, Griffin was adjudicated a delinquent minor after he committed two residential burglaries; he was sent to McLaughlin Youth Center and later released on juvenile probation. While on probation, Griffin absconded from Alaska. He was later found incarcerated in the State of Washington, where he had committed another burglary and had been sentenced to a youth camp. Griffin was released from Alaska juvenile supervision on his eighteenth birthday (June 18, 1986).

The following year, Griffin committed his first adult felonies. He was convicted of two counts of second-degree theft in Case No. 3AN–87–5477 Cr, and another two counts of second-degree theft in Case No. 3AN–87–7512 Cr. Griffin was sentenced to a composite term of 4 years' imprisonment with 3 years suspended (1 year to serve). Since that time, Griffin has spent nearly his whole life either in prison or on parole / probation supervision.

In 1991, Griffin committed a new string of felonies. He was convicted in Case No. 3AN–91–5493 Cr of first-degree burglary, two counts of second-degree theft, and what would now be third-degree weapons misconduct (felon in possession of a concealable firearm). For these crimes, Griffin received a composite sentence of 10 years' imprisonment with 3 years suspended (7 years to serve).

Griffin was released from prison in February 1996. He committed several probation violations during the remainder of that year, but the court apparently continued his probation. The following year, Griffin was sent to prison for a month (in July/August 1997). He was sent back to prison again in April 1998. Then, shortly after his release, he committed the crimes which are the subject of this appeal.

**1.** *State v. Wentz*, 805 P.2d 962, 965 (Alaska 1991) (quoting *McClain v. State*, 519 P.2d 811, 813 (Alaska 1974)).

*Griffin's current offenses: Case No. 3PA–98–1584 Cr*

On the afternoon of June 19, 1998, 64 year old Barbara Christensen came home to find a strange car parked in her driveway. It turned out that four people (three men and a woman) were in the process of burglarizing her residence. The burglars made off with armloads of Christensen's property, but their actions were recorded on a security camera tape. This tape showed that one of the men—later identified as Griffin—was holding a handgun as he approached the front door.

When the police arrived to investigate, they discovered that the house had been ransacked. The burglars had stolen approximately $64,000 worth of jewelry, furs, art, and heirlooms.

Christensen's residence had a camera security system. The police obtained a copy of the surveillance tape and released it (along with still photographs made from it) to the media in hopes of identifying the burglars. Within several days, the police received tips identifying the woman as Jamie Keylor and identifying two of her male companions as Mark Spencer and Michael Griffin.

The police also learned that Jamie Keylor had pawned some of the victim's jewelry on June 20th (the day after the burglary). The police assembled a photographic lineup that included Keylor's picture, and the victim subsequently identified Keylor from this photo lineup.

Based on this information, the police obtained a search warrant for Keylor's residence, where they found more of the stolen property. When Keylor was interviewed, she confessed that she had driven the three men (including Griffin) to the victim's house. Their plan was to burglarize the residence—but if the homeowner was present, they would use handguns to secure her cooperation.

Keylor explained that when Ms. Christensen came home and surprised the burglars, they loaded the stolen goods into Keylor's car and drove to the house of Griffin's girlfriend, Susan Richardson. They stored the stolen property in Richardson's garage.

Based on their interview with Keylor, the police obtained a search warrant for Richardson's house. Inside, they discovered a semiautomatic "assault" rifle that had been reported stolen in an Anchorage burglary. Richardson told the police that this rifle belonged to Griffin. The police also found a loaded .357 magnum revolver. Richardson claimed that the revolver was hers, but when the State later charged Griffin with violating his probation by possessing this revolver, he admitted the allegation. (Griffin was on probation and parole at this time; under the conditions of his release, he was prohibited from possessing firearms.)

Based on Griffin's participation in the burglary / theft, a "no bail" parole warrant was issued for Griffin's arrest.

*Griffin's current offenses: Case No. 3PA–98–1597 Cr*

Shortly after midnight on July 10, 1998 (approximately three weeks after the Christensen burglary), Officer Swihart of the Palmer Police made a traffic stop. It turned out that the driver of the car, George Watson, had a suspended driver's license; in addition, there was an outstanding arrest warrant for Watson's arrest. A second officer, Officer Rowland, now arrived to assist Swihart. Watson was handcuffed and placed in the rear seat of Swihart's patrol car.

Two passengers were riding in Watson's car. One of these passengers identified himself as "Donald Peitre". However, "Mr. Peitre" was carrying an ID card that identified him as Michael Griffin. Griffin kept asking for permission to return to Watson's car. (The police later discovered a duffle bag containing loaded firearms inside the car.) Swihart refused Griffin's request and instead informed Griffin that he was under arrest.

But when Swihart attempted to handcuff Griffin, Griffin pushed the officer aside and started to run away. When Swihart grabbed for Griffin, Griffin tried to seize the officer's sidearm. Mistakenly thinking that he had hold of the officer's gun, Griffin pulled an object free from the officer's belt and began to yell, "I've got your gun! I've got your gun!" Griffin had in fact seized the officer's baton. When Griffin realized his mistake, he

then grabbed the officer's sidearm (which was still holstered) and tried to wrest it free. The two men grappled on the ground. Griffin repeatedly struck Swihart in the face and head. Swihart used pepper spray on Griffin, but to no apparent effect.

In the meantime, Officer Rowland had been chasing the other passenger (who had also run away). But when Rowland heard Griffin yelling, "I've got your gun!", he came back to aid Swihart. Finding Swihart and Griffin struggling together on the ground, Rowland seized Griffin's head and sprayed Griffin in the face with more pepper spray. Despite this, Griffin continued to resist, and it took the efforts of both officers to subdue him.

Griffin was handcuffed behind his back and placed in the rear seat of Officer Rowland's patrol car. Rowland then tried to raise the plexi-glass shield between the front and rear seats, but the mechanism was broken. The officers left Griffin in the car while they stood outside, trying to shake the effects of the pepper spray. (Both officers had gotten pepper spray in their faces during the struggle with Griffin.) In the meantime, three state troopers—Sgt. Ballard, Trooper Burkmire, and Trooper Roleff—arrived in separate cars to lend their assistance. Burkmire and Roleff parked their vehicle behind Rowland's patrol car.

As Swihart, Rowland, and Ballard stood outside, they heard the engine of Rowland's patrol car begin to race. Griffin had managed to get his cuffed hands around to the front of his body, and then he had climbed from the rear seat into the driver's seat. Griffin looked backwards and saw Trooper Burkmire and Trooper Roleff sitting in the car behind him. Griffin shifted into reverse and rammed the trooper car, causing head and neck injuries to the two troopers.

Griffin then shifted into "drive" and sent the car forward, aiming for the spot where Officer Swihart and Trooper Sgt. Ballard were standing next to Swihart's patrol vehicle. Rowland yelled at Griffin to stop the car. When Griffin did not respond, Rowland pulled his weapon and fired five shots at

Griffin. Griffin was hit by three of these rounds, but he still did not stop.

Officer Swihart moved aside to avoid being struck. Sgt. Ballard also saw Griffin coming, but he did not immediately move to safety. He stayed behind because George Watson, the driver with the suspended license, was still handcuffed in the back of Swihart's patrol car—in the path of danger. Ballard tried to get Watson out of the back seat, but there was not enough time: Ballard had to leap aside just as Griffin hit the patrol car from the rear. Watson was in fact injured in this collision, and Ballard returned to assist him.

Griffin was able to ram the stolen police car through a small space between Officer Swihart's patrol car and Sgt. Ballard's patrol car (striking and damaging both cars in the process). Having broken free, he drove away. Two other state troopers, Sgt. Baty and Trooper Cyr, were summoned, and a high-speed chase ensued. Griffin eventually headed down the Glenn Highway toward Anchorage. At the turn-off to Eklutna Lake, he left the Glenn Highway and drove toward the lake, but he lost control of the car and slid off the road. Sgt. Baty and Trooper Cyr were then able to catch and subdue him.

Griffin (who was suffering from three gunshot wounds) was taken to the hospital. When the police searched his clothes, they found several items of jewelry and $800 in cash. Ms. Christensen (the victim of the June 20th burglary) later identified this jewelry as hers.

*Griffin's convictions from these two criminal episodes*

In Case No. 98–1584 (the burglary / theft), the State charged Griffin with first-degree robbery, first-degree burglary, first-degree theft, second-degree criminal mischief, and third-degree weapons misconduct. Griffin ultimately agreed to plead no contest to a reduced theft charge—second-degree theft[2] —in exchange for dismissal of the other charges.

In Case No. 98–1597 (the assault / escape episode), the State charged Griffin with two

2.  AS 11.46.130(a)(1).

counts of attempted murder (Griffin's attempt to strike Swihart and Ballard with the stolen police car), five counts of third-degree assault, five counts of second-degree criminal mischief, one count of vehicle theft, and assorted other crimes. Griffin ultimately pleaded no contest to attempted first-degree assault[3], second-degree escape[4], third-degree assault[5], fourth-degree assault[6], third-degree weapons misconduct[7], and driving while intoxicated[8].

Griffin's most serious crimes—attempted first-degree assault and second-degree escape-are both class B felonies.[9] They carry a maximum sentence of 10 years' imprisonment.[10] As a "third felony offender" for presumptive sentencing purposes, Griffin faced a 6–year presumptive term for these offenses.[11]

Second-degree theft, third-degree assault, and third-degree weapons misconduct are class C felonies.[12] They carry a maximum sentence of 5 years' imprisonment.[13] Griffin faced a 3–year presumptive term for these offenses.[14]

*Testimony at the sentencing hearing*

At the sentencing hearing, Griffin took the stand and claimed that he was innocent of most of the charges.

*The burglary / theft:* Griffin testified that he had not participated in the burglary of the Christensen residence, although he admitted that he later traded cocaine to Keylor and Spencer for some of the stolen jewelry. With respect to the items of jewelry found on his person at the hospital, Griffin testified that this jewelry was his own—that it did not belong to Christensen.

During cross-examination, the prosecutor showed Griffin photographs produced from the security camera tape at the Christensen residence. At least one of these photographs showed a man approaching the front door, holding a gun. When the prosecutor asked Griffin if the man depicted in the photograph was him, Griffin denied it. The prosecutor also asked Griffin to explain how a pair of Griffin's eyeglasses was found inside the Christensen residence. Griffin speculated that Keylor had stolen his fanny pack (which contained several personal items, including the eyeglasses) and had left the eyeglasses inside the residence in order to frame him. Griffin told the court that Keylor was motivated to falsely accuse him because she owed him $700 for drugs, and she feared retribution because she could not pay him. According to Griffin, Keylor must have thought that she could escape her drug debt if she had him sent to prison.

In support of Griffin's testimony, Griffin's attorney offered a tape recording of a telephone call that Jamie Keylor had placed to the attorney's office. In that telephone call, Keylor recanted her accusations against Griffin; she stated that she lied when she told the police that Griffin was involved in the burglary. (Keylor failed to honor her subpoena to appear at the sentencing hearing; her whereabouts were unknown.)

Griffin's attorney also presented the supporting testimony of Griffin's former girlfriend, Susan Richardson. Richardson testified that she knew Griffin could not have taken part in the Christensen burglary because she remembered telephoning him at her home at 4:00 on the afternoon of June

3.  AS 11.41.200(a)(1).

4.  AS 11.56.310(a)(1)(B).

5.  AS 11.41.220(a)(1).

6.  AS 11.41.230(a)(1).

7.  AS 11.61.200(a)(1).

8.  AS 28.35.030(a)(1).

9.  *Attempted first-degree assault:* AS 11.41.200(b) and AS 11.31.100(d)(3). *Second-degree escape:* AS 11.56.310(b).

10.  AS 12.55.125(d).

11.  AS 12.55.125(d)(2).

12.  *Second-degree theft:* AS 11.46.130(c). *Third-degree assault:* AS 11.41.220(d). *Third-degree weapons misconduct:* AS 11.61.200(i).

13.  AS 12.55.125(e).

14.  AS 12.55.125(e)(2).

19th (the approximate time of the burglary) and interrupting his bath. She also testified that the discovery of the assault rifle in her house came as a complete surprise to her. Neither she nor Griffin had ever seen it before. She speculated that the former occupants of the residence must have left the weapon under the couch when they moved out.

To rebut this testimony, the State called Mark Spencer (another one of the burglars). Spencer, who was Griffin's co-defendant, was not particularly co-operative with the prosecutor. Spencer admitted taking part in the burglary of the Christensen residence, but he claimed that only three people were involved—himself, Jamie Keylor, and another man named Clint Nauls. According to Spencer, he had no idea where Griffin was that day. Spencer speculated that Keylor might now be saying that there were four burglars because she was trying to shift responsibility to others—i.e., to Griffin.

Compelled to "cross-examine" his own witness, the prosecutor played the video from the security camera. After viewing the video, Spencer was forced to admit that four different people had entered the Christensen residence, but Spencer testified that he had no idea who this fourth burglar was.

The prosecutor later presented the testimony of State Trooper Ruth Josten. Josten testified that she had interviewed Jamie Keylor three times. During these interviews, Keylor had always maintained that Griffin was one of the four burglars and that he was armed when he went into the house. Josten also testified that she traveled to San Antonio, Texas to accompany Clint Nauls back to Alaska after a Texas court ordered his extradition. Nauls also told her that Griffin was one of the burglars.

In addition, Josten was the officer who found the pair of eyeglasses in the kitchen area of Christensen's house. Christensen said that the glasses did not belong to her, and their ownership remained a mystery until the police obtained a search warrant to open the duffle bag that was found in George Watson's car following the assault / escape episode. This duffle contained two address books belonging to Griffin (as well as four firearms and several items of jewelry that had been stolen from the Christensen residence). One of the entries in Griffin's address book was a notation for "Vista Optical". Trooper Josten called and found out that Griffin had purchased eyeglasses there. Another trooper investigator took the eyeglasses found in Christensen's home and showed them to a Vista Optical employee; the employee identified the prescription and the frames as Griffin's.

*The assault / escape episode:* Griffin denied that he owned the handguns found in the duffle bag in George Watson's car, and he further testified that he never asked to go back into the car. Griffin also denied that he purposely aimed the stolen police car at Officer Swihart and Trooper Sgt. Ballard. Griffin explained that he was simply trying to escape, he had Mace in his eyes, and he was lying down on the front seat of the car because Rowland had just shot him three times.

Officer Swihart took the stand to rebut Griffin's testimony. Swihart testified that Griffin drove directly at him and Ballard, accelerating as he came. In addition, Swihart testified that Griffin definitely asked if he could get back into Watson's car to get a cigarette.

As already described, Trooper Josten testified that the duffle bag in Watson's car contained two address books belonging to Griffin. The duffle also contained four firearms, including a Smith & Wesson .38 Special and a Para–Ordinance P–12, a .45 caliber handgun that had been reported stolen in an Anchorage burglary.

*Judge Smith's findings and sentencing decision*

After hearing this conflicting testimony, Judge Smith found that Griffin had in fact participated in the Christensen burglary. Judge Smith also found that Griffin had asked to get back into Watson's car and that the weapons in that car belonged to Griffin. In addition, Judge Smith found that Griffin had intentionally aimed the stolen police car at Swihart and Ballard. Finally, with regard to the jewelry found on Griffin's person after

he was captured, Judge Smith found that this jewelry was stolen during the burglary and did not belong to Griffin. The judge found that Griffin's testimony on this point was "utterly incredible". In essence, Judge Smith found that Griffin had repeatedly perjured himself.

Griffin conceded that various aggravating factors listed in AS 12.55.155(c) applied to his sentences. He admitted that he had three or more prior felonies[15] and that he was on felony probation and parole when he committed all of these crimes[16].

With respect to the second-degree theft conviction arising from the Christensen burglary, Griffin conceded that his criminal history included repeated theft crimes[17] and that one of his prior felonies that triggered presumptive sentencing was more serious than his current offense[18]. Judge Smith found two other aggravators: (c)(10)—that Griffin's conduct was among the most serious within the definition of second-degree theft because Griffin was actually guilty of burglary as well as theft[19]; and (c)(4)—that Griffin employed a dangerous weapon (*i.e.*, a handgun) in furtherance of the offense.

With respect to the second-degree escape, Griffin conceded aggravator (c)(1)—that people were injured as a result of Griffin's conduct. Judge Smith found aggravator (c)(10)—conduct among the most serious, and (c)(13)—that Griffin knowingly directed his conduct toward police officers.

In his sentencing remarks, Judge Smith noted that Griffin has been in trouble with the law for practically all of his adult life. Moreover, Judge Smith concluded that Griffin's current offenses were quite serious. As the judge noted, "The theft to which [Griffin] pled was really a burglary. And, had Ms.

Christensen been home, it would have been an armed robbery." Additionally, Judge Smith concluded that, with respect to "[t]he attempted assaults and escape that [Griffin] committed when the police pulled over Mr. Watson, I think 'egregious' would be a good word."

Based both on Griffin's criminal history and the aggravated nature of his current offenses, Judge Smith found that Griffin was a "worst offender" for sentencing purposes in both Case No. 98–1584 and Case No. 98–1597.[20] The judge also concluded that Griffin's sentence should emphasize the sentencing criteria of isolation, protection of the public, and community condemnation of Griffin's conduct.[21]

Judge Smith acknowledged the *Mutschler* rule[22]—the rule that, ordinarily, a defendant who is convicted of multiple offenses should not receive a composite sentence more severe than the maximum term for the defendant's most serious offense (in Griffin's case, 10 years' imprisonment). But Judge Smith explicitly found that a sentence longer than 10 years was necessary to protect the public.

Nevertheless, despite his findings regarding the seriousness of Griffin's offenses, Judge Smith concluded that Griffin's composite sentence for these offenses should not exceed 20 years. The judge stated that, even though Griffin's offenses were extremely serious, they were still class B and class C felonies, and Griffin's composite term should reflect this fact.

For the theft arising from the burglary of the Christensen residence, Judge Smith sentenced Griffin to the maximum term: 5 years' imprisonment. For the crimes arising from the assault / escape episode, Judge

---

15. Aggravator (c)(15).

16. Aggravator (c)(20).

17. Aggravator (c)(21).

18. Aggravator (c)(7).

19. We also note that the amount stolen, $64,000, meant that Griffin's crime was actually first-degree theft.

20. *See State v. Wortham*, 537 P.2d 1117, 1120 (Alaska 1975); *Napayonak v. State*, 793 P.2d

1059, 1062 (Alaska App.1990) (a defendant can be classified as a "worst offender" based either on the circumstances surrounding the defendant's present offense, or on the defendant's criminal history, or both).

21. *See* AS 12.55.005.

22. *See Mutschler v. State*, 560 P.2d 377, 380–81 (Alaska 1977); *George v. State*, 836 P.2d 960, 963–64 (Alaska App.1992).

Smith sentenced Griffin to a composite term of 12 years to serve (plus another 12 years, 362 days suspended). The judge declared that Griffin's sentences in the two cases would run consecutively because the cases arose from "separate, ... egregious, ... aggravated crimes". Thus, Griffin received a composite 17 years to serve for his current offenses.

In addition, Judge Smith revoked all of Griffin's remaining suspended time from his prior felonies. Because of Griffin's various probation releases and revocations, the parties were not able to tell the court precisely how much suspended time was remaining, but they agreed that it was between 5 and 6 years. By law, this revoked suspended time must run consecutively to the sentences Griffin received for his new crimes.[23] Thus, Griffin's true composite sentence is somewhere between 22 and 23 years to serve.

*Our analysis of Griffin's sentence*

█ The obvious first issue is the propriety of Judge Smith's *Mutschler* finding—his ruling that the public safety required a composite sentence greater than 10 years to serve. Given Griffin's long criminal history, the seriousness of Griffin's current offenses, and the apparent failure of all prior attempts to supervise Griffin on probation and parole, Judge Smith was justified in concluding that the public safety called for a sentence greater than 10 years to serve.

█ The second (and more difficult) issue is the propriety of Griffin's composite sentence—between 22 and 23 years to serve.

█ When we review a composite sentence imposed for two or more criminal convictions, we assess whether the combined sentence is clearly mistaken, given the whole

of the defendant's conduct and history.[24] Griffin's criminal history is lengthy, and his many failures at probation and parole give little reason for optimism concerning his future conduct. From the time Griffin was a teenager, he has repeatedly committed burglary and theft. Moreover, the seriousness of his crimes appears to be increasing.

Griffin relies on a series of sentencing decisions in which this court favorably cited the American Bar Association's suggestion that a 10–year term of imprisonment was adequate punishment for all but the most dangerous offenders.[25] But this line of authority has been expressly disapproved by the Alaska Supreme Court.[26] The supreme court has declared that "it is [not] appropriate for [appellate] courts to rigidly define the length of sentence that can be justified by any particular criterion".[27]

Griffin points out that his record consists almost entirely of burglaries and thefts, mainly comprising class B and class C felonies. But although Griffin's prior offenses have been property crimes, his current offenses show that he is now willing to use great violence to carry out his crimes and to escape apprehension. As Judge Smith found, Griffin carried a weapon to the Christensen residence and, if the victim had been home, Griffin was prepared to commit robbery. Three weeks later, Griffin used extreme violence in his efforts to thwart his own arrest and, thereafter, to escape from custody. Moreover, by attempting to get back to the firearms hidden in George Watson's car, and then by attempting to wrest control of Officer Swihart's sidearm, Griffin showed that he was willing to use life-threatening violence to achieve his goals. In short, Griffin poses two sorts of public danger:

**23.** See AS 12.55.025(e); *Smith v. State,* 892 P.2d 202, 203 (Alaska App.1995); *Jennings v. State,* 713 P.2d 1222, 1223 (Alaska App.1986).

**24.** See *Neal v. State,* 628 P.2d 19, 21 n. 8 (Alaska 1981); *Comegys v. State,* 747 P.2d 554, 558–59 (Alaska App.1987).

**25.** See, e.g., *Bumpus v. State* (*Bumpus I*), 776 P.2d 329, 335 (Alaska App.1989); *DeGross v. State,* 768 P.2d 134, 140–41 (Alaska App.1989). This line of authority actually stems from the

supreme court's decision in *Donlun v. State,* 527 P.2d 472 (Alaska 1974). In *Donlun,* the supreme court endorsed the ABA's suggested ceiling on felony sentences (which, at that time, was 5 years' imprisonment). See 527 P.2d at 475.

**26.** See *State v. Bumpus* (*Bumpus II*), 820 P.2d 298, 302 (Alaska 1991); *State v. Wentz,* 805 P.2d 962, 966 n. 5 (Alaska 1991).

**27.** *Bumpus II,* 820 P.2d at 302.

first, his seemingly intractable recidivism [28], and second, his escalation to the use of violence.

To aid our assessment of Griffin's sentence, we have re-examined the two decisions in *Bumpus v. State:* our decision, *Bumpus I* [29], and the supreme court's decision, *Bumpus II* [30].

Bumpus participated in a series of burglaries of resort cabins in the Matanuska / Susitna Valley. He was one of a group of five men: four of these men (including Bumpus) burglarized cabins, while the fifth member of the group acted as a "fence" for the stolen property. The burglary ring operated throughout the summer of 1987 and was responsible for approximately fifty burglaries, although Bumpus did not become a member of the group until early July.

At the time of these offenses, Bumpus was twenty-nine years old. He had an extensive adult criminal record. In 1977, he was convicted of shoplifting and burglary of a non-dwelling. He served 180 days in jail. The following year, he was convicted of receiving stolen merchandise, a felony for which he received a suspended sentence. In 1984, Bumpus was convicted of second-degree burglary, his third felony conviction. He received a 3 year presumptive term, and he was released from prison in July 1987. Almost immediately thereafter, he became involved in the burglary ring described above.

The superior court sentenced Bumpus to a composite term of 23 years to serve. [31] On appeal, this court concluded that 23 years was clearly mistaken—that Bumpus's composite term should not exceed 15 years to serve. [32] The supreme court vacated both the superior court's and this court's decisions, and then the court remanded Bumpus's case to the superior court for re-sentencing. [33] From the supreme court's explanation of its decision, it appears that the court believed that Bumpus's proper sentence lay somewhere between the superior court's sentence (23 years) and this court's sentence (15 years).

The supreme court stated that it was "skeptical ... that Bumpus deserve[d] twenty-three years". [34] The court noted that, although the sentencing judge had found various aggravating factors, the judge had not explicitly analyzed the relative importance of these factors. [35] Moreover, the judge had not expressly found that a sentence of 23 years was necessary to protect the public, nor had he attempted to explain why Bumpus was receiving such an extraordinary sentence— what the supreme court described as "the longest sentence ever received by a burglar in this state". [36]

Nevertheless, the supreme court did not agree that the superior court's sentencing decision should be reversed outright. Rather, the court concluded that the propriety of the sentence could not be determined until the superior court further explained its decision. [37] For much the same reason, the supreme court vacated this court's ruling that Bumpus should not, under any circumstances, receive more than 15 years to serve. [38] The court declared, "Without articulated findings concerning the factors that determine the range of reasonable sentences, a sentence of fifteen years is as arbitrary and unsupportable as a sentence of twenty-three

**28.** *See State v. Graybill,* 695 P.2d 725, 731 (Alaska 1985) (an extensive record of non-violent offenses can qualify a defendant as a "dangerous offender").

**29.** *Bumpus v. State,* 776 P.2d 329 (Alaska App. 1989).

**30.** *State v. Bumpus,* 820 P.2d 298 (Alaska 1991).

**31.** *Bumpus II,* 820 P.2d at 300.

**32.** *Bumpus I,* 776 P.2d at 338.

**33.** *Bumpus II,* 820 P.2d at 305.

**34.** *Bumpus II,* 820 P.2d at 304.

**35.** *Id.* at 304. *See also Juneby v. State,* 641 P.2d 823, 838 (Alaska App.1982), *on rhrg,* 665 P.2d 30, 32–33 (Alaska App.1983) (the amount of sentence adjustment for aggravating and mitigating factors should be assessed in light of the *Chaney* sentencing criteria).

**36.** *Bumpus II,* 820 P.2d at 304.

**37.** *Id.* at 304–05.

**38.** *Id.* at 305.

years." [39] But, from the manner in which the supreme court critiqued this court's approach to the case, it is clear that the supreme court was not suggesting that a 15–year sentence was just as likely to be excessive as a 23–year sentence. Quite the opposite:

> The court [of appeals]' abrupt choice of a fifteen-year term is, on its face, not moored to any principle. [The court might be suggesting] that fifteen years is the most any burglar not convicted of other crimes should receive in this state, but nothing in the applicable statutes, the prior case law, or the appellate court's reasoning explains why fifteen years should be the upper limit.
>
> In *Shagloak v. State*, 582 P.2d 1034, 1039–40 (Alaska 1978), a case involving an offender arguably less worthy of condemnation than Bumpus, we held that a fifteen[-]year sentence for a single burglary was not excessive. This certainly suggests that, for purposes of appellate review, the "range of reasonableness" in Bumpus' case extends past the fifteen year mark.

*Bumpus II*, 820 P.2d at 303.

From the supreme court's treatment of the burglary sentence in *Bumpus II*, we conclude that Griffin's sentence of between 22 and 23 years to serve is not clearly mistaken. In *Bumpus II*, the supreme court indicated that, depending on the facts, Bumpus might receive a sentence exceeding 15 years (and, perhaps, a sentence of up to 23 years). And when we compare the facts of *Bumpus* to the facts of Griffin's case, we see that Griffin is more deserving of punishment.

Both Bumpus and Griffin had lengthy histories of burglary and theft. (If Griffin's juvenile offenses are included, Griffin has a fifteen-year string of burglaries and thefts.) Both returned to crime shortly after their most recent release from prison. But unlike Bumpus (who aided the authorities in trying to retrieve the stolen property, and who helped the police apprehend some of his fellow burglars) [40], Griffin resolutely denied many aspects of his crimes—and perjured himself in doing so. Moreover, Bumpus confined himself to non-violent crime, while Griffin was convicted of several assaults and of an attempt to inflict serious physical injury on two law enforcement officers.

Based on the supreme court's decisions in *Bumpus II* and *Wentz*, we conclude that Griffin's composite sentence of 22–23 years to serve is within the range of reasonable sentences that should not be disturbed on appeal. Accordingly, the sentencing decision of the superior court is AFFIRMED.

---

**39.** *Id.*

**40.** *See id.* at 299, 304.