[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14439

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 16 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-01014-CV-3-IPJ

ROBERT R. LONG,
KELLY L. LONG,
as Personal Representatives of the
Estate of Bryan L. Long, deceased,

Plaintiffs-Appellees,

versus

JIMMIE RAY SLATON, JR.,
RONNIE WILLIS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(November 16, 2007)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and FORRESTER,*
District Judge.

_____
*      Honorable J. Owen Forrester, United States District Judge for the Northern District of
       Georgia, sitting by designation.

EDMONDSON, Chief Judge:

This appeal involves deadly force, the Fourth Amendment, and qualified immunity. Jimmie Slaton ("Deputy Slaton" or "Slaton") and Ronnie Willis ("Sheriff Willis" or "Willis") (collectively, "Defendants") appeal the district court's denial of their motion to dismiss on qualified immunity grounds this section 1983 suit arising out of the death of Bryan Long ("Long"). Dr. Robert R. Long ("Long's father") and Kelly Long (collectively, "Plaintiffs"), representatives of Long's estate, filed suit against Defendants in their individual capacities. Plaintiffs' complaint alleges that Deputy Slaton shot and killed Long in violation of Long's "civil rights."[1] Because we conclude that Plaintiffs' complaint fails to state a claim for a violation of Long's Fourth Amendment rights and that the applicable law was not already clearly established at the pertinent time, we reverse the district court's order.

## I. Background

The complaint alleges these facts. In May 2005, Long's father, a medical doctor, went to the Lauderdale County Probate Court seeking to have Long

---

[1] On appeal, Plaintiffs are arguing the Fourth Amendment.

2

committed to a hospital because Long was suffering from a "psychotic episode."

But Long's father was unable to have Long committed because of a lack of

available hospital beds. While returning to his residence,[2] Long's father called the

Lauderdale County Sheriff's Department and requested assistance due to Long's

psychosis. Upon arrival at his home, Long's father waited in his vehicle for help to

arrive.

Deputy Slaton responded to the call and arrived at the Long residence

shortly thereafter. Slaton, who was alone, got out of his marked sheriff's cruiser,[3]

leaving the keys in the ignition and the driver's door open. Slaton then spoke to

Long's father, who explained his desire that Long be detained due to Long's

---

[2] The complaint states that the Long residence is located on the outskirts of Florence, Alabama, on an 18-acre lot. The nearest neighbor is about half a mile away. The property's 250-foot driveway connects to a county road.

[3] Plaintiff's complaint refers to Deputy Slaton's vehicle as a "cruiser." The word "cruiser" is defined as "a police-car that patrols the streets," from which we infer that Deputy Slaton's vehicle was a marked sheriff's patrol vehicle. See 4 Oxford English Dictionary 80 (2d ed. 1989) (1928). Although we rely on the ordinary meaning of the term "cruiser" as a marked police patrol vehicle, this fact (which no one has disputed) is directly supported by an investigative report from the Alabama Bureau of Investigation, which Plaintiffs submitted to the district court as an attachment to Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss. The report indicates that the vehicle was a marked sheriff's cruiser complete with county tags, a flashing light bar on the roof, two police radios, and other emergency equipment. At the 12(b)(6) stage, we "primarily consider the allegations in the complaint," but "[t]he court is not [always] limited to the four corners of the complaint." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 at 376-77 (3d ed. 2004). Because Plaintiffs submitted the investigative report in opposing Defendants' motion to dismiss and because the document's authenticity and veracity are in this case unchallenged, we look to the report to confirm that the ordinary meaning of "cruiser" applies as an undisputed fact for Deputy Slaton's sheriff's cruiser.

3

psychosis. When Deputy Slaton asked Long's father if Long had been physically violent with him, the father responded, "no."

Deputy Slaton then approached Long, who was at the end of the driveway, close to the house. Slaton pulled out handcuffs and told Long that Slaton would take Long to jail. Long voiced his disagreement and then ran over to and got inside Slaton's cruiser and closed the door. Slaton then ran to the driver's side of the cruiser, pointed his pistol at Long, and ordered Long to get out of the cruiser. Deputy Slaton threatened to shoot Long if Long did not comply. Long then shifted the cruiser into reverse and began backing away and down the driveway toward the road. Slaton stepped into the middle of the driveway and fired three shots at Long as the sheriff's cruiser moved away. One shot went through the windshield and struck Long in the chest. The cruiser stopped as it rolled into an embankment, and Long died after about a minute. At the time, backup law enforcement was en route.[4]

---

[4] The complaint also alleges that Deputy Slaton was under the influence of an illegal drug, as evidenced by these facts: (1) a marijuana cigarette was found in the sheriff's cruiser after the shooting; (2) Slaton was never tested for drugs after the shooting; and (3) Long's body tested negative for marijuana. This allegation, however, has no application in the objective Fourth Amendment analysis of whether an objectively reasonable officer, facing the circumstances in this case could lawfully use deadly force. See Graham v. Connor, 109 S. Ct. 1865, 1872 (1989) ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). Plaintiffs argue that whether Deputy Slaton was under the influence of marijuana is relevant to the reasonableness of his overall acts. But the Fourth Amendment issue is whether an officer reasonably could have used deadly force when confronted with the situation

## II. Discussion

We review de novo a trial court's denial of a motion to dismiss a complaint on qualified immunity grounds.[5] Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1327 (11th Cir. 2003). In determining whether Plaintiffs' complaint alleges the violation of a clearly established right, we accept the allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the Plaintiffs. Id. We first ask whether a constitutional violation occurred; we then ask whether the violation was already clearly established by the law at the time. Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001).

### A. Excessive Force and the Fourth Amendment

---

at the scene, not whether a reasonable officer would have smoked marijuana before arriving. We judge the application of force to see if it was excessive, not the particular officer's qualities.

[5] The district court denied Defendants' motion to dismiss the day after briefing was completed on the motion and with no explanation, stating simply that the court was "of the opinion that the motion to dismiss is due to be denied." This kind of order is of no help to an appellate court. In addition, such a summary denial of qualified immunity does not clearly demonstrate that the district court had entirely taken to heart the Supreme Court's instruction to courts about the duty to treat seriously motions raising immunity and to grant qualified immunity at the earliest possible point in the litigation. See Anderson v. Creighton, 107 S. Ct. 3034, 3042 n.6 (1987) (rejecting the argument that qualified immunity cannot be granted before discovery and stating that "qualified immunity questions should be resolved at the earliest possible stage of a litigation"); Mitchell v. Forsyth, 105 S. Ct. 2806, 2815 (1985) (stating that the "entitlement" of qualified immunity is "immunity from suit rather than a mere defense to liability").

5

We first examine whether Deputy Slaton's use of deadly force was excessive and violated the Fourth Amendment. The standard for whether the use of force was excessive under the Fourth Amendment is one of "objective reasonableness." See Graham v. Connor, 109 S. Ct. 1865, 1867-68 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 1872.

In the context of deadly force, the Supreme Court has set out examples of factors that justify the use of such force:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Tennessee v. Garner, 105 S. Ct. 1694, 1701 (1985). Garner says something about deadly force but not everything, especially when facts vastly different from Garner are presented. The Supreme Court has cautioned that "Garner did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" Scott v. Harris, 127 S. Ct. 1769, 1777 (2007).

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Graham, 109 S. Ct. at

6

1872 (quoting Bell v. Wolfish, 99 S.Ct. 1861 (1979)) (alteration in original), we must "slosh our way through the factbound morass of 'reasonableness.'" Scott, 127 S. Ct. at 1778. Therefore, determining whether "the use of a particular type of force in a particular situation" is "reasonable" in the constitutional sense[6] requires a court to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Scott, 127 S. Ct. at 1777, 1778 (quoting United States v. Place, 103 S. Ct. 2637, 2642 (1983)).

In examining whether an officer's use of deadly force is reasonable, we recognize that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 109 S. Ct. at 1872. So "[w]e are loath to second-guess the decisions made by police officers in the field." Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003).

Accepting the facts as alleged in the complaint as true, we conclude that

---

[6] The Fourth Amendment's "reasonableness" standard and the standard of "reasonable care" under tort law are not the same. An officer may fail to exercise "reasonable care" as a matter of state tort law yet still act reasonably in the federal constitutional sense. "The United States Constitution [and] traditional tort law . . . do not address the same concerns." Daniels v. Williams, 106 S. Ct. 662, 666 (1986) (concluding that "injuries inflicted by governmental negligence are not addressed by the United States Constitution") (Fourteenth Amendment case); see also Purcell ex rel. Estate of Morgan v. Toombs County, 400 F.3d 1313, 1324 (11th Cir. 2005) ("'Reasonable care' under tort law is not the same thing as reasonable safety within the meaning of the federal Constitution.") (Eighth Amendment case).

Deputy Slaton's force was objectively reasonable under the Fourth Amendment. Although Slaton's decision to fire his weapon risked Long's death, that decision was not outside the range of reasonableness in the light of the potential danger posed to officers and to the public if Long was allowed to flee in a stolen police cruiser. "[U]nder the law, the threat of danger to be assessed is not just the threat to officers at the moment, but also to the officers and other persons if the chase went on." Pace v. Capobianco, 283 F.3d 1275, 1280 n.12 (11th Cir. 2002). "[T]he question then is whether, given the circumstances, [Long] would have appeared to reasonable police officers to have been gravely dangerous." Id. at 1281. Considering the circumstances surrounding the shooting, including the threat posed by Long's condition and behavior, this question must be answered "yes."

We stress these facts: Long was mentally unstable; and he had taken control of not just any vehicle, but a police cruiser. This police cruiser was marked as a Lauderdale County Sheriff's patrol car and was equipped with a flashing light bar on the roof, two police radios, and other emergency equipment. Under Alabama law, a motor vehicle is, at least, potentially a "dangerous instrument" -- that is, an instrument "highly capable of causing death or serious bodily injury." Ala. Code § 13A-1-2(5). Different from other vehicles, this fully marked and fully equipped police cruiser had an even greater potential for causing -- either intentionally or

8

otherwise -- death or serious bodily injury.

Even if we accept that the threat posed by Long to Deputy Slaton was not immediate in that the cruiser was not moving toward Slaton when shots were fired,[7] the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect. See Pace, 283 F.3d at 1282 (concluding at the summary judgment stage that officers did not use excessive force in shooting a suspect who had stopped his vehicle after a high-speed chase -- even though the court accepted that, at the time of the shooting, the suspect had neither tried to run over nor aimed the vehicle at officers); Blanford v. Sacramento County, 406 F.3d 1110, 1116-19 (9th Cir. 2005) (concluding that officers did not use excessive force in shooting a suspect who was carrying a sword, had failed to comply with orders to drop the sword, and was attempting to enter a house that – as far as the officers knew – might or might not have been empty, even though the suspect was at all times walking away from the officers and did not actually threaten the officers – or anyone else – with the weapon); cf. Montoute v. Carr, 114 F.3d 181, 185 (11th Cir. 1997) ("[A]n officer is not required to wait until an armed and dangerous felon has drawn a bead on the

---

[7] We note the obvious: Long could have quickly shifted gears and accelerated towards Deputy Slaton at any time. An objectively reasonable officer would have known this fact.

officer or others before using deadly force.").[8]

Although at the point of the shooting Long had not yet used the police cruiser as a deadly weapon, Long's unstable frame of mind, energetic evasion of the deputy's physical control, Long's criminal act[9] of stealing a police cruiser, and Long's starting to drive – even after being warned of deadly force – to a public road gave the deputy reason to believe that Long was dangerous. See Blanford, 406 F.3d at 1117-19 (concluding that third volley of shots hitting sword-carrying suspect – who "appear[ed] intent on accessing a [place] . . . where his sword could inflict injury that the deputies would not then be in a position to prevent" – was not excessive force because "the deputies knew that Blanford had committed a crime, albeit not a violent one, and was continuing a course of conduct that objectively indicated he was not giving up the sword that made him a threat to anyone in charging range").

Protecting the innocent public from risks that are not remote is a government

___

[8] Montoute is a qualified immunity decision. The person shot by police (who were responding to a report of shots fired) was carrying a sawed-off shotgun, walking away from officers, and ignoring warnings to drop the weapon; the person had not pointed the weapon at anyone, and the police did not know he was a shooter. 114 F.3d at 183, 185.

[9] Deputy Slaton had probable cause to believe that Long had committed at least two crimes under Alabama law, including at least one felony, by taking control of and attempting to flee in a stolen sheriff's cruiser: (1) unauthorized use of a vehicle, see Ala. Code § 13A-8-11(a)(1); and (2) theft of property in the first degree, see Ala. Code §§ 13A-8-2, 13A-8-3(b).

10

interest. See Scott, 127 S. Ct. at 1778 (noting the importance of the relative culpability of a fleeing driver who had ignored officers' warnings to stop as compared to the innocent public). Even a quick check of only published appellate decisions shows the risk of serious harm to the public in the circumstances facing Deputy Slaton was not imaginary. In many cases, people have stolen police vehicles and used them to engage in further criminal conduct or otherwise to harm innocent people. See, e.g., People v. Hyde, 166 Cal. App. 3d 463 (Cal. Ct. App. 1985) (man stole police vehicle, used it to stalk victim by impersonating police officer, and later pulled over, kidnaped, and murdered victim); Chapman v. City of Quitman, 954 So.2d 468 (Miss. Ct. App. 2007) (plaintiff sued city after member of angry mob snuck past officer, stole police cruiser, and used it to run down plaintiff who saw the cruiser approaching but thought it was driven by officers coming to his aid); Rios v. City of Del Rio, 444 F.3d 417 (5th Cir. 2006) (city police chief and officer were sued after escaped prisoner took possession of officer's patrol car and later crashed it into and severely injured customs enforcement officer assisting city police in chasing prisoner); Griffin v. State, 9 P.3d 301 (Alaska Ct. App. 2000) (man resisted arrest, stole police cruiser, put cruiser in reverse and rammed another cruiser injuring two officers inside, and attempted to run down other officers who shot and injured man, after which man smashed through officers' cruisers and led

11

police on high-speed chase); Bryant v. County of Los Angeles, 26 Cal. App. 4th 919  (Cal. Ct. App. 1994) (county and sheriff's deputy were sued after man stole sheriff's patrol car, drove away, and caused accident that left another person a quadriplegic); Duarte v. City of San Jose, 100 Cal. App. 3d 648 (Cal Ct. App. 1980) (police officers and city were sued by homeowner who was hit by a stolen police car while he was mowing his lawn); Pile v. City of Brandenburg, 215 S.W.3d 36 (Ky. 2006) (city was sued after officer left inebriated man in back of police cruiser with engine running and emergency lights flashing, after which man took control of cruiser, sped away, and crashed into another vehicle, killing himself as well as woman in other vehicle); Thomas v. Gallant Ins. Co., 733 So.2d 1236 (La. Ct. App. 1999) (man took control of idling police vehicle, sped off to escape from officers, and then crashed head-on into another vehicle); State Farm Mut. Auto. Ins. Co. v. Montagna, 874 A.2d 406 (Me. 2005) (man ran from sheriff's detective, stole detective's cruiser, and then drove cruiser at and hit detective); People v. Vasquez, 341 N.W.2d 873 (Mich. Ct. App. 1983) (man took police car, drove away from police at excessive speeds, disobeyed traffic signals, and crashed into and killed motorcyclist); Felty v. City of Lawton, 578 P.2d 757 (Okla. 1977) (city was sued after man stole police cruiser, crashed head-on with another vehicle, resulting in death of woman); Vaughn v. City of Tulsa, 974 P.2d 188 (Okla. Ct.

12

App. 1998) (city was sued after man was arrested and placed in back of police cruiser, after which he took control of cruiser and crashed into and injured victims); Rowe v. City of Chattanooga, 666 S.W.2d 469 (Tenn. Ct. App. 1983) (city was sued after officer left police cruiser running in parking lot, and man stole cruiser, drove away, and crashed into and injured other people); Finnigan v. Blanco County, 670 S.W.2d 313 (Tex. Ct. App. 1984) (county was sued after man stole county sheriff's vehicle, which led to chase and crash that killed woman). Failing to stop a psychotic man from driving away in a marked sheriff's cruiser not only would have provided the man with a potentially (to say the least) lethal weapon, but also would have cloaked him with the apparent authority of a law enforcement officer.

The Supreme Court also has noted that providing a warning to a fleeing suspect weighs in favor of the reasonableness of using deadly force. See Garner, 105 S. Ct. at 1701 (noting the importance of a warning if feasible). Deputy Slaton gave clear warning of the intent to use deadly force before firing his weapon. Under the circumstances, we do not accept that Slaton's use of deadly force to stop Long from fleeing in the sheriff's cruiser was beyond the outside border of constitutionally reasonable conduct.

Plaintiffs argue that Long's death could have been avoided by using

alternative means of apprehending Long such as shooting out the tires of the cruiser, using spike strips, or allowing Long to leave and then tracking the easily identifiable cruiser and arresting Long at a different location. We suppose that other means of stopping Long's escape existed that, if used, also might have prevented Long from harming others. But considering the unpredictability of Long's behavior and his fleeing in a marked police cruiser, "[w]e think the police need not have taken that chance and hoped for the best." See Scott, 127 S. Ct. at 1778 (responding to the argument that the police could have avoided the accident had they ceased their pursuit). The circumstances made the time to think short. Even if Deputy Slaton's decision to fire his weapon was not the best available means of preventing Long's escape and preventing potential harm to others, we conclude that Slaton's use of deadly force was not an unreasonable means of doing so.

For these reasons, Plaintiffs' complaint fails to state a claim for the violation of Long's Fourth Amendment rights.[10]

---

[10] The complaint's only allegation about Sheriff Willis was that he "failed to institute a constitutionally compliant policy governing use of deadly force . . . and/or failed to properly and adequately train [Slaton] in regard to such a policy." Because Plaintiffs have failed to state a claim for the violation of a constitutional right, Plaintiffs' supervisory claims against Willis also fail. See City of Los Angeles v. Heller, 106 S. Ct. 1571, 1573 (1986) (concluding that whether police policies and regulations were proper is "beside the point" when "a person has suffered no constitutional injury at the hands of the individual police officer"); Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation.").

14

## B. Qualified Immunity

Even if Slaton's use of deadly force was excessive under the Fourth Amendment, we conclude alternatively that Defendants are entitled to qualified immunity because they, especially given the circumstances, violated no clearly established right. "[T]he purpose of the qualified immunity doctrine is to give meaning to the proposition that '[g]overnment officials are not required to err on the side of caution' when it comes to avoiding constitutional violations." See Crosby v. Monroe, 394 F.3d 1328, 1334 (11th Cir. 2004) (quoting Marsh v. Butler County, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc)) (second alteration in original). For background, see Hunter v. Bryant, 112 S. Ct. 534, 537 (1991).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 106 S. Ct. 1092, 1096 (1986); accord Bashir v. Rockdale County, 445 F.3d 1323, 1327 (11th Cir. 2006). Defendants, in their individual capacities, are entitled to qualified immunity unless their "supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given

15

the circumstances."  Pace, 283 F.3d at 1282.

Pointing to law pre-existing the events in the pertinent case, Plaintiffs have the burden of demonstrating that Defendants -- at the pertinent time and given the specific circumstances of this case -- had  fair notice  that their conduct would violate clear federal law.  Vineyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002).  To demonstrate that the law at the time clearly established that Defendants' conduct would violate the Constitution, Plaintiffs might point to either (1) earlier case law from the Supreme Court, this Court, or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with "obvious clarity" to the circumstances, establishing clearly the unlawfulness of Defendants' conduct.  See Marsh, 268 F.3d at 1031-33 & nn. 9-10; Willingham v. Loughnan, 321 F.3d 1299, 1301-03 (11th Cir. 2003); Vineyard, 311 F.3d at 1349-53.  And "where the applicable legal standard is a highly general one, such as 'reasonableness,' preexisting case law that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law."  Thomas v. Roberts, 323 F.3d 950, 954 (11th Cir. 2003).

Plaintiffs have failed to cite controlling and materially similar case law that would establish that Deputy Slaton's use of deadly force was clearly unlawful. Plaintiffs cite Vaughan, 343 F.3d 1323, as a materially similar case. But it is factually too different.

We do not read Vaughan as capable of putting every objectively reasonable officer on notice that deadly force could not be used in the circumstances presented in this case. In Vaughan, this Court concluded that an officer used unreasonable force when he, without warning, discharged his firearm at suspects fleeing in a stolen truck. See id. at 1330-32. The present case has, at least, three additional facts not present in Vaughan and that an objectively reasonable police officer could believe "might make a difference" for whether the conduct in the present instance would violate federal law. See generally Marsh, 268 F.3d at 1032 (discussing when pre-existing precedents cannot clearly establish the applicable law). In this case, unlike Vaughan, the fleeing driver was in an unstable frame of mind, had taken possession of a marked police cruiser, and had been warned that deadly force would be used if he did not leave the cruiser. Therefore, we believe that the situation in Vaughan is too different from this case to cause every objectively reasonable officer to know that the use of deadly force in the circumstances of this case must violate federal law.

17

Plaintiffs also attempt to rely on Garner, 105 S. Ct. 1694, as having clearly established broad principles that cover the contours of this case with obvious clarity. As the Supreme Court recently pointed out, however, "[w]hatever Garner said about the factors that might have justified shooting the suspect in that case, such 'preconditions' have scant applicability to this case, which has vastly different facts."[11] Scott, 127 S. Ct. at 1777.

> [W]hen we look at decisions such as Garner and Graham, we see some tests to guide us in determining the law in many different kinds of circumstances; but we do not see the kind of clear law (clear answers) that would apply with such obvious clarity to the circumstances of this case that only an incompetent officer or one intending to violate the law could possibly fail to know that what the police did here violated federal law.

Pace, 283 F.3d at 1283 (shooting of a fleeing suspect in vehicle); accord Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004) (same). Simply put, the Supreme Court's decision in Garner -- which does not involve a fleeing motor vehicle -- offered little insight on whether an officer, consistently with the Fourth Amendment, may use deadly force to stop a man who has stolen a police cruiser and has been given clear warnings about the use of deadly force. Garner does not apply to the

---

[11] "Garner held that it was unreasonable to kill a 'young, slight, and unarmed' burglary suspect by shooting him 'in the back of the head' while he was running away on foot and when the officer 'could not reasonably have believed that [the suspect] . . . posed any threat,' and 'never attempted to justify his actions on any basis other than the need to prevent escape." Scott, 127 S. Ct. at 1777 (internal citation omitted) (alteration in original).

circumstances of this case with obvious clarity.

Nor does this case present otherwise an obvious violation of Long's rights under the Fourth Amendment. We do not believe that every objectively reasonable officer in Deputy Slaton's position must have known that firing his weapon at the police cruiser under these circumstances would be an unconstitutional application of force. Results in these kinds of cases -- involving reasonableness and balancing -- are extremely fact dependent; at worst, Deputy Slaton's acts fell within the "hazy border between excessive and acceptable force.'" Saucier, 121 S. Ct. at 2158 (quoting Priester v. Riviera Beach, 208 F.3d 919, 926-27 (11th Cir. 2000)). Therefore, because preexisting law did not provide fair warning that shooting at Long in this situation would violate federal law, Defendants are entitled to qualified immunity.[12]

### III. Conclusion

Accepting the allegations in Plaintiffs' complaint as true, we conclude that

---

[12] Even if Slaton's use of deadly force was excessive under the Fourth Amendment, Sheriff Willis was also entitled to qualified immunity. We do not believe that a failure to implement and train officers on a deadly force policy that covers the circumstances of this case constitutes a deliberate indifference to Long's constitutional rights; nor do we believe that such a conclusion was clearly established at the time of the shooting.

Plaintiffs have failed to state a claim for a violation of Long's Fourth Amendment rights. Deputy Slaton's use of deadly force was constitutionally reasonable under the circumstances. Even if Plaintiffs could establish that Slaton's use of deadly force was excessive under the Fourth Amendment, the applicable law was not already clearly established at the time of the shooting. Thus, the district court erred in denying Defendants' motion to dismiss.

REVERSED and REMANDED.

FORRESTER, District Judge, concurring in part and dissenting in part:

I respectfully dissent from the opinion of the majority in the action against Deputy Slaton .

To the recitation of the facts by the majority, I would add that Deputy Slaton had dealt with the deceased before without any major problem and that the shooting occurred in a fairly rural area several miles from Florence, Alabama.

As I understand the law, the use of deadly force is reasonable only where there is a serious threat of imminent or immediate physical harm to the officer or others. *See*, *e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985); *Beshers v. Harrison*, 495 F.3d 1260, 1266-67 (11th Cir. 2007); *Robinson v. Arrugueta*, 415 F.3d 1252, 1256-57 (11th Cir. 2005); *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003). I can find no arguable probable cause for such a belief in this case. To be sure, with the deceased in possession of a patrol car, the outcome of these events is uncertain, but the possibility that a nonviolent fleeing felon will later pose a threat of physical harm to others is remote and highly speculative.

I do not believe that this officer is entitled to qualified immunity either. *Vaughan* provides notice that seizing a fleeing felon in a vehicle by shooting him is unreasonable. Although there are differences between that case and this, *Vaughan*

21

is not "fairly distinguishable." *See Vinyard v. Wilson*, 311 F.3d 1340, 1351-53 (11th Cir. 2002). In *Vaughan*, the truck was northbound on I-85 between Newnan and Atlanta traveling at speeds exceeding eighty miles per hour. At one point it rammed a police vehicle which was attempting a rolling roadblock. These facts present circumstances more fraught with immediate threat than those in the instant case, and this court determined that a jury could find that the officers in *Vaughan* violated the suspect's Fourth Amendment rights and were not entitled to qualified immunity.[1]

---

[1]I concur in the majority opinion's determination that the plaintiffs have failed to state a claim against Sheriff Ronnie Willis.