[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14554

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 31, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:10-cv-23968-UU

CORRINE BROWN,
MARIO DIAZ-BALART,

Plaintiffs - Appellants,

FLORIDA HOUSE OF REPRESENTATIVES,

Intervenor Plaintiff - Appellant,

versus

SECRETARY OF STATE OF THE STATE OF FLORIDA,

Defendant-Appellee,

ACLU OF FLORIDA,
LEON W. RUSSELL, et al.,

Intervenor Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 31, 2012)

Before DUBINA, Chief Judge, MARCUS and FAY, Circuit Judges.

MARCUS, Circuit Judge:

At issue today is whether a state constitutional provision establishing standards for congressional redistricting that was approved by the people by initiative is contrary to the Elections Clause of the United States Constitution. Article I, Section 4 of the United States Constitution provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Appellants Corrine Brown and Mario Diaz-Balart, members of the United States House of Representatives, along with the Florida House of Representatives, appeal from a district court order granting final summary judgment to the appellees, the Florida Secretary of State and various intervening parties. The appellants claim that Amendment Six is unconstitutional because it was enacted by citizen initiative rather than by the state's legislature in the ordinary "legislative process." Moreover, they say that Amendment Six -- even if properly enacted pursuant to Florida's legislative process -- imposes substantive requirements that far exceed the state legislature's Elections Clause power.

We are unpersuaded. In the first place, the Florida voters' act of lawmaking

2

according to the state's expressly enumerated lawmaking process is fully consistent with the commands of the federal Constitution's Elections Clause, and consonant with the understanding given to the Elections Clause by the Supreme Court in two cases that all parties agree are controlling -- Ohio ex rel. Davis v. Hildebrant, 241 U.S. 565 (1916), and Smiley v. Holm, 285 U.S. 355 (1932). As for the second claim, we also have little difficulty in concluding that the factors enumerated in Amendment Six have been for many years commonly considered by legislative bodies in congressional redistricting and long accepted by the courts as being lawful and consistent with the powers delegated to the state legislatures by the United States Constitution. Accordingly, we affirm the order of summary judgment entered by the district court.

## I.

According to the Florida Constitution, the people of Florida may use an initiative process to amend any part of their constitution. Fla. Const. art. XI, § 3 ("The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people . . . ."). Once the backers of an initiative petition obtain sufficient signatures in support, the proposed amendment appears on the general election ballot. See id. §§ 3, 5(b). A proposed amendment passes if it is approved by at least sixty percent of those voting on the

measure.  Id. § 5(e).

In an initiative petition approved by the Florida Secretary of State on September 28, 2007, FairDistrictsFlorida.org proposed a constitutional amendment to Article III of the state constitution that would set some standards for the legislature to use in the congressional redistricting process.  The initiative petition obtained sufficient signatures, and the proposal was placed on the November 2, 2010, general election ballot as Amendment Six.  Amendment Six passed, garnering the approval of over sixty-two percent of those voting.[1]

Amendment Six was codified as Article III, Section 20 of the Florida Constitution.  Article III of the Florida Constitution addresses the nature and power of the state legislature.  See Fla. Const. art. III.  The newly added Section 20 reads this way:

> SECTION 20.   Standards for establishing congressional district boundaries.—In establishing congressional district boundaries:
>
> (a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.

---

[1] At the same election, Florida voters also approved Amendment Five, which sets identical standards for the legislature to use in drawing state legislative districts. See Fla. Const. art. III, § 21. The appellants' constitutional challenge is limited to Amendment Six.

4

(b)  Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

(c)  The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

Fla. Const. art. III, § 20.[2]

On November 3, 2010, Plaintiff-Appellants Corrine Brown and Mario Diaz-Balart, members of the United States House of Representatives from Florida, challenged the constitutionality of Amendment Six in the United States District Court for the Southern District of Florida.  They sought a declaratory judgment that Amendment Six was invalid under the Elections Clause of the U.S. Constitution, as well as injunctive relief prohibiting its enforcement.  The plaintiffs later amended their complaint and voluntarily dismissed a defendant, leaving Kurt Browning, in his official capacity as Florida's Secretary of State, as the sole defendant.  The district court allowed the Florida House of Representatives to intervene as a party plaintiff and several individuals and

---

[2] In May 2011, the Department of Justice precleared Amendment Six pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.  Letter from T. Christian Herren, Jr., Chief, Voting Section, U.S. Dep't of Justice Civil Rights Div., to Andy Bardos, Special Counsel to the President of the Fla. Senate, and George Levesque, General Counsel to the Fla. House of Representatives (May 31, 2011), available at www.flsenate.gov/UserContent/session/redistricting/20110531_usDOJ_PreclearA5A6.pdf.

organizations to intervene as defendants.[3]

All of the parties moved for summary judgment, and, by order dated September 9, 2011, the district court granted final summary judgment in favor of the defendant and defendant-intervenors.

The district court looked to the history of the Elections Clause and to Supreme Court precedent in construing the meaning of Article I, Section 4 and its application to Amendment Six. The court squarely rejected the claim that Amendment Six violates the Elections Clause because it was enacted outside the legislative process. The district court explained that controlling Supreme Court case law established that a state constitutional amendment validly enacted pursuant to state law  may  restrict the legislature's exercise of its Elections Clause power. The court also rejected the argument that Amendment Six amounted to an unconstitutional substantive limitation on the state legislature's power to regulate elections. Finally, the district court determined that Amendment Six did not implicate Supreme Court precedent invalidating regulations that "favor or disfavor

---

[3] Defendant-Intervenors are: (i) American Civil Liberties Union of Florida (ACLU-FL); (ii) Howard Simon, Benetta M. Standly, Susan Watson, and Joyce Hamilton Henry, residents and registered voters of Florida who are members and officers of ACLU-FL;  (iii) Florida State Conference of NAACP Branches; (iv) Democracia Ahora; (v) Leon W. Russell, Patricia T. Spencer, Carolyn H. Collins, Edwin Enciso, and Stephen Easdale, residents and registered voters of Florida who voted for Amendment Six; and (vi) Senator Arthenia L. Joyner, Representative Janet Cruz, Representative Luis R. Garcia, Jr., Representative Joseph A. Gibbons, and Representative Perry E. Thurston, Jr., members of the Florida Legislature and potential U.S. congressional candidates.

. . . candidates" or "dictate electoral outcomes," see U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 833-34 (1995), because the conditions imposed by Amendment Six favor no one.

The plaintiffs and plaintiff-intervenor timely appealed to this Court. In view of the shortness of time before the national elections this fall, we expedited oral argument and our review.

## II.

We review a district court's grant or denial of summary judgment de novo. Holloman v. Mail-Well Corp., 443 F.3d 832, 836 (11th Cir. 2006). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." Id. at 836-37; accord Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this case, both sides agree that there are no material facts in dispute.

It is abundantly clear from the text of the Constitution that the states have no inherent authority to regulate congressional elections. Rather, because federal offices are the creature of and "arise from the Constitution itself," any state authority to regulate election to federal offices "had to be delegated to, rather than reserved by, the States." Cook v. Gralike, 531 U.S. 510, 522 (2001) (alteration

7

omitted) (quoting U.S. Term Limits, 514 U.S. at 804-05). The Supreme Court has recognized that "States may regulate the incidents of [congressional] elections . . . only within the exclusive delegation of power under the Elections Clause." Id. at 523. Clause 1 of Article I, Section 4 of the U.S. Constitution, commonly known as the Elections Clause, specifically delegates regulatory power to the states to prescribe the manner of selecting members of Congress. It provides in full:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1.

The appellants' basic argument boils down to this: Amendment Six violates the Elections Clause because the amendment was not enacted through the state's legislative process. Rather, the governing provision was unlawfully enacted by citizen initiative (albeit pursuant to the constitution of the state), and the codification process was therefore not prescribed "by the Legislature thereof." In fact, they claim, allowing the people to proceed in this way would effectively read the "Legislature" out of the Elections Clause, denuding the legislature of its textual authority. Thus, the key question we face is how to read the phrase "by the Legislature thereof."

8

The text of the Elections Clause itself does not provide the answer. Nor does the Clause's history. Debate about the Elections Clause prior to the ratification of the U.S. Constitution focused almost exclusively on the Clause's second part, which allows Congress to supervise or alter the states' exercise of their Elections Clause power. See Joseph Story, Commentaries on the Constitution of the United States § 409, at 291 (Carolina Academic Press 1987) (1833) (noting that the Elections Clause had vigorous opponents, whose "objection was not to that part of the clause, which vests in the state legislatures the power of prescribing the times, places, and manner of holding elections," but "to the superintending power of congress to make, or alter such regulations").[4]

[4] Starting at the Constitutional Convention itself, a vocal opposition argued that Congress should not be able to trump the states' electoral regulations. See 2 The Records of the Federal Convention of 1787, at 240 (Max Farrand ed., rev. ed. 1974) (relaying that two delegates at the Convention moved to strike the second part of the Elections Clause because the states "could [and] must be relied on in such cases"). Opponents contended that the second part of the Elections Clause provided an unnecessary and unlimited power that might be abused by Congress, and that sole control should instead rest with the states, which better represented the people. See, e.g., Federal Farmer, No. 3 (1787), reprinted in 2 The Founders' Constitution 249, 249 (Philip B. Kurland & Ralph Lerner eds., 1987) ("[M]any evils may flow from that part [of the Clause] which authorises the congress to regulate elections--Were it omitted, the regulations of elections would be solely in the respective states, where the people are substantially represented; and where the elections ought to be regulated . . . ."). Supporters countered that such abuses were extremely improbable, and that congressional supervision was essential for the preservation of the federal government itself -- since states might otherwise neglect or refuse to provide for the election of representatives -- and might be useful in the future to afford uniformity in national elections. See, e.g., The Federalist Nos. 59-61 (Alexander Hamilton) (arguing, respectively, that Congress needed the power to intervene, because otherwise a few states intent on dissolving the union could use their Elections Clause power to prevent congressional elections from being held; that concerns about congressional abuse of its oversight power were "chimerical"; and that such supervision could prove advantageous by allowing for uniformity in the time of congressional elections); Debate in Virginia Ratifying Convention, in

But we are concerned instead with the first part of the Clause, which delegates regulatory power over elections to the states in the first instance. The Framers said precious little about the first part of the Clause, and they said nothing that would help to resolve the issue now before us: what it means to repose a state's Elections Clause power in "the Legislature thereof."[5]

_____

2 The Founders' Constitution, supra, at 266, 268 (statement of James Madison) (explaining that electoral regulation must be "subject to the control of the general government, in order to enable it to produce uniformity, and prevent its own dissolution").

This debate, although focused on the division of power between the federal and state governments rather than within the states themselves, sheds some light on the Framers' intentions in delegating the initial regulatory power to the state "Legislature[s]." Not surprisingly, those considering the Constitution recognized the distinction between the state legislature and the people themselves. See, e.g., Debate in Massachusetts Ratifying Convention, in 2 The Founders' Constitution, supra, at 254, 259 (statement of Judge Francis Dana) (noting that although Senators were to be appointed, Representatives would "proceed directly from the people, and not from their substitutes, the legislatures"). But it was hoped that the state legislature, in exercising its Elections Clause power, would act according to the will of the people. See, e.g., Debate in New York Ratifying Convention, in 2 The Founders' Constitution, supra, at 268, 269 (statement of John Jay) ("The will of the people certainly ought to be the law, but the only question was . . . whether the will of the people, with respect to the time, place, and manner of holding elections, ought to be expressed by the general government, or by the state legislatures."); Federal Farmer, No. 12 (1788), reprinted in 2 The Founders' Constitution, supra, at 253, 254 (arguing that electoral regulations "ought to be left to the state legislatures, they coming far nearest to the people themselves"). Indeed, it was suggested that the Elections Clause power was delegated to the legislature simply because it was the only body within a state capable of exercising such power. See, e.g., The Federalist No. 59, at 398-99 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ("[T]here were only three ways, in which this power [over elections] could have been reasonably modified and disposed, that it must either have been lodged wholly in the National Legislature, or wholly in the State Legislatures, or primarily in the latter, and ultimately in the former."); Debate in Massachusetts Ratifying Convention, supra, at 255 (statement of Caleb Strong) ("I know of but two bodies wherein [the power to regulate federal elections] can be lodged -- the legislatures of the several states, and the general Congress." (emphasis removed)).

[5] At the Constitutional Convention, the delegates considered the two parts of the Elections Clause separately. The only recorded discussion regarding the first part of the Clause was a proposal

The Supreme Court, however, has provided a clear and unambiguous answer to this question, twice explaining that the term "Legislature" in the Elections Clause refers not just to a state's legislative body but more broadly to the entire lawmaking process of the state. The Court had occasion to construe the term "Legislature" in the Elections Clause in two principal cases -- Ohio ex rel. Davis v. Hildebrant, 241 U.S. 565 (1916), and Smiley v. Holm, 285 U.S. 355 (1932). On one occasion, the Court held that the people (through a referendum process) could use a state's constitutionally provided veto power to reject the state legislature's congressional redistricting plan, and, then on another, that the governor could lawfully do so as well.

Hildebrant was the first case to consider a direct challenge under the Elections Clause to the method of enacting electoral regulations. The Ohio Constitution expressly granted to the people the right "by way of referendum to approve or disapprove by popular vote any law enacted by the general assembly," and the people exercised this power to disapprove the general assembly's

---

to restrict its application to the election of Representatives only, on the theory that the state legislatures' right to regulate the times, places, and manner of the election of Senators was inherent in the right to appoint them. 2 The Records of the Federal Convention of 1787, supra, at 239-40. After rejecting this proposal, the delegates proceeded to a vote on the first part of the Clause, which was unanimously approved. Id. at 240. As for the period between the Convention and ratification, we have been unable to find any record of any discussion of the first part of the Elections Clause at the state ratification debates or in the Federalist Papers or any other contemporaneous writings.

congressional redistricting plan. <u>Hildebrant</u>, 241 U.S. at 566. The Supreme Court held this use of the referendum power to be constitutional. <u>Id.</u> at 570. The Court first observed that, "so far as the state had the power to do it, the referendum constituted a part of the state Constitution and laws, and was contained within the legislative power." <u>Id.</u> at 568. Having posited that the referendum power was an integral part of the legislative process, the Court rejected the claim that using this referendum power to strike a redistricting act violated the Elections Clause. <u>Id.</u> at 569. The Court explained that any such challenge "must rest upon the assumption that to include the referendum in the scope of the legislative power is to introduce a virus which destroys that power, which in effect annihilates representative government, and causes a state where such condition exists to be not republican in form," but that a challenge under the republican-form-of-government guarantee of Article IV, Section 4 of the U.S. Constitution is not justiciable. <u>Id.</u>

Four years later, the Court discussed <u>Hildebrant</u> in <u>Hawke v. Smith</u>, 253 U.S. 221 (1920). In <u>Hawke</u>, the Court held that Ohio's referendum power could not be used to disapprove the ratification of a proposed amendment to the U.S. Constitution, because Article V of the U.S. Constitution requires that ratification

12

be "by the Legislatures." Id. at 226 (quoting U.S. Const. art. V).[6] The Court

rejected the argument that Article V merely requires "ratification by the legislative

action of the states through the medium provided" in state law, reasoning that

ratification "is not an act of legislation within the proper sense of the word." Id. at

229. What is notable for our purposes is that the Court distinguished Hildebrant

because "Article 1, section 4, plainly gives authority to the state to legislate within

the limitations therein named," and "[s]uch legislative action is entirely different

from the requirement of the Constitution as to the expression of assent or dissent

to a proposed amendment," an act in which "no legislative action is authorized or

required." Id. at 230-31.

In Smiley, the Court expanded upon this functional approach to construing

the word "Legislature." Smiley involved a challenge to the Minnesota governor's

exercise of his veto power, contained in the state constitution, against a

congressional redistricting act passed by the state legislature. 285 U.S. at 361-63.

The Court framed the issue as being whether the Elections Clause "invests the

Legislature with a particular authority, and imposes upon it a corresponding duty,

the definition of which imports a function different from that of lawgiver, and thus

---

[6] Article V also allows for the ratification of constitutional amendments by state conventions, but that method of ratification was not at issue in Hawke. Hawke, 253 U.S. at 225-26.

13

renders inapplicable the conditions which attach to the making of state laws." Id. at 365.  The Court explained that the term "legislature" means different things in different constitutional provisions, depending on "the function to be performed." Id.  Thus, a state legislature may act as an electoral body, ratifying body, consenting body, or lawmaking body, id. at 365-66, but the Court concluded that the Elections Clause "embrace[s] authority to provide a complete code for congressional elections" and thus "involves lawmaking in its essential features and most important aspect," id. at 366.

And because the Elections Clause broadly contemplates the exercise of the lawmaking function, the state legislature can be constrained by restrictions imposed by the state's constitution, such as those embodied in a gubernatorial veto.  Writing for the Court, Chief Justice Hughes explained:

> As the authority is conferred for the purpose of making laws for the state, it follows, in the absence of an indication of a contrary intent, that the exercise of the authority must be in accordance with the method which the state has prescribed for legislative enactments.  We find no suggestion in the federal constitutional provision of an attempt to endow the Legislature of the state with power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted.  Whether the Governor of the state, through the veto power, shall have a part in the making of state laws, is a matter of state polity. [The Elections Clause] neither requires nor excludes such participation.  And provision for it, as a check in the legislative process, cannot be regarded as repugnant to the grant of legislative authority.

14

Id. at 367-68 (emphases added). The Court observed that the Framers had been aware of the gubernatorial veto, id. at 368, yet they had expressed no intention to exclude such a "restriction imposed by state Constitutions upon state Legislatures when exercising the lawmaking power," id. at 369. Ultimately, the Supreme Court held that nothing in the Elections Clause "precludes a state from providing that legislative action in districting the state for congressional elections shall be subject to the veto power of the Governor as in other cases of the exercise of the lawmaking power," id. at 372-73, because the Elections Clause confers no authority upon the state legislature to redistrict "independently of the participation of the Governor as required by the state Constitution," id. at 373.

The Court in Smiley added that Hildebrant was also based on this functional analysis of the term "Legislature." Id. at 372 ("[I]t was because of the authority of the state to determine what should constitute its legislative process that the validity of the [referendum], in its application to congressional elections, was sustained. This was explicitly stated by this Court as the ground of the distinction which was made in Hawke . . . ."). In short, the Court has held that the rejection by the governor or by the people of a legislature's congressional redistricting act is an exercise of lawmaking power pursuant to the state constitution and, thus, fully part of the lawmaking process contemplated by the Elections Clause.

15

In the face of this precedent, we have little difficulty in rejecting the appellants' claim that the phrase "by the Legislature thereof" in the Elections Clause somehow refers only to a state's legislative body. The Supreme Court has plainly instructed us that this phrase encompasses the entire lawmaking function of the state. That a law was enacted by the people themselves, pursuant to state law, rather than by the state legislative body, is not enough to invalidate that action under the Elections Clause. The focus remains on the state's lawmaking process, whether the governor of the state participates in the making of state laws by exercising his veto power, or the people participate in the making of state laws through the state's referendum process.

We are hard-pressed to understand how the term "Legislature" as used in the Elections Clause could properly include within its ambit the governor's and people's ability to flatly reject redistricting legislation, but would not also include the people's lawfully prescribed initiative power to provide some guidance for how the legislature may exercise its discretion in drawing congressional districts. We can see no material difference between the state veto provisions upheld in Hildebrant and Smiley and Florida's Amendment Six, which was constitutionally enacted by referendum according to Florida law. Again, the Elections Clause "neither requires nor excludes such participation" in state lawmaking. Smiley, 285

16

U.S. at 368. And this check on the legislative process "cannot be regarded as repugnant to the grant of legislative authority," any more than the other limitations can be. See id.

Like the veto provisions at issue in Hildebrant and Smiley, Florida's citizen initiative is every bit a part of the state's lawmaking function. Under the Florida Constitution, the people have the power to amend their constitution by initiative. Fla. Const. art. XI, § 3. And according to the Florida Supreme Court, "[a]n amendment to the Constitution, duly adopted, is [an] expression of the will and intent of the law-making power." State v. Div. of Bond Fin. of Dep't of Gen. Servs., 278 So. 2d 614, 617 (Fla. 1973). Thus, the lawmaking power in Florida expressly includes the power of the people to amend their constitution, and that is exactly what the people did here in passing Amendment Six. Cf. Hildebrant, 241 U.S. at 568 ("[S]o far as the state had the power to do it, the referendum constituted a part of the state Constitution and laws, and was contained within the legislative power.").

It's also worth noting that Amendment Six is housed in Article III, the legislative article of the Florida Constitution.[7] Amendment Six, like the preceding

_____

[7] The provisions at issue in Hildebrant and Smiley were likewise housed in the legislative articles of their respective state constitutions. Smiley, 285 U.S. at 363 (observing that article IV of the Minnesota Constitution addresses the legislature, and that the governor's veto power appeared

17

nineteen sections of Article III, explicates the power of the legislature and sets forth the rules that govern how the legislature may act.  <u>See</u> Fla. Const. art. III, §§ 1-19 (prescribing, among other things, the composition of the legislature, when sessions shall be held, what constitutes a quorum, and how bills are passed).[8]  Amendment Six simply informs the process by which the legislature is to go about its task of redistricting.  Like the rest of Article III, it constitutes an integal part of the state's lawmaking power.

Indeed, Amendment Six does not go as far as the limitations upheld by the Supreme Court in <u>Hildebrant</u> and <u>Smiley</u>.  If the lawmaking function properly includes the power of the governor or the people, pursuant to the state constitution, to veto a reapportionment act, then it seems abundantly clear that the people of Florida, acting pursuant to their state constitution's initiative process, can provide some general guidance to the legislature regarding the exercise of its redistricting power.  The power to reject outright a legislative enactment drawing congressional district boundaries is far more substantial than the power to

---

in section 11 of article IV); <u>Hildebrant</u>, 241 U.S. at 566 (explaining that the Ohio Constitution vested the state legislative power not only in the general assembly but also in the people via their referendum power).

[8] Amendment Six is not the only section of Article III that imposes limits on the legislature's exercise of power.  <u>See, e.g.</u>, Fla. Const. art. III, § 6 (laws may embrace only one subject and matter); <u>id.</u> § 8 (gubernatorial veto); <u>id.</u> § 11 (no special laws or general laws of local application relating to certain enumerated topics).

18

participate in the process by enacting some general rules (most of which have long been accepted as part of the redistricting process) stated at a high order of abstraction. A veto completely invalidates the legislature's redistricting act, but, in contrast, Amendment Six does not prevent the legislature from drawing the new district lines and implementing the legislation it has created.

Nor can it be fairly said that the standards imposed by the text of Amendment Six so limit the state legislature's discretion as to eviscerate its constitutionally delegated power and effectively exclude the legislature from the redistricting process. Amendment Six enumerates six standards to inform the redistricting process. To begin with, the requirement of drawing congressional districts of nearly equal population is already imposed by federal law. See Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964) (holding that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's"); Kirkpatrick v. Preisler, 394 U.S. 526, 530-31 (1969) (explaining that the Wesberry standard requires states to "make a good-faith effort to achieve precise mathematical equality" in the populations of congressional districts). Similarly, Amendment Six's provision regarding racial and language minorities follows almost verbatim the requirements embodied in the Voting Rights Act, which governs redistricting in Florida, and thus the provision cannot be said to

19

have further diminished the legislature's power.  Compare Fla. Const. art. III, § 20

(Amendment Six), with 42 U.S.C. §§ 1973, 1973c (codifying Voting Rights Act of

1965, Pub. L. No. 89-110, §§ 2, 5, 79 Stat. 437, 437, 439).[9]  Three other

guideposts found in Amendment Six -- compactness, contiguity, and respect for

political and geographic boundaries -- are nothing more than traditional factors

that legislative bodies have historically considered in redistricting.  See Shaw v.

Reno, 509 U.S. 630, 647 (1993) (observing that "compactness, contiguity, and

respect for political subdivisions" are "traditional districting principles"); Bush v.

Vera, 517 U.S. 952, 1048 (1996) (Souter, J., dissenting) (noting that these

traditional districting principles are "widely accepted among States").  The only

remaining standard in Amendment Six is the requirement that districts shall not be

drawn with the intent to favor or disfavor an incumbent or a political party.  This

requirement does not so constrain the legislature as to effectively gut its power to

---

[9] The fact that only five Florida counties are subject to preclearance under Section 5 of the Voting Rights Act is of no moment.  See 28 C.F.R. pt. 51, app. (listing jurisdictions where the requirements of Section 5 apply).  Not only is it impossible to draw districts for the five covered counties independently of drawing districts for Florida's other sixty-two counties, but the entire state is subject to the requirements of Section 2 of the Voting Rights Act, and a Section 2 violation is established by a showing that members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b); see also id. §§ 1973(a), 1973b(f)(2) (extending Section 2 protection to racial and language minorities).  This is similar to the language contained in Amendment Six. Compare id. § 1973(b), with Fla. Const. art. III, § 20(a) (prohibiting districts "drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice").

redistrict. In fact, it dictates no outcome. Moreover, this too is a legitimate factor that a legislature may choose to consider or decline to consider in the reapportionment process. See Karcher v. Daggett, 462 U.S. 725, 740 (1983). Beyond these six standards, Amendment Six does not prevent or inhibit the legislature in any way from considering any number of other factors. And at the end of the day, Florida's legislature is still responsible for drawing the congressional district lines.

Quite simply, since the phrase "by the Legislature thereof" in the Elections Clause refers to the state's entire lawmaking function, and the power of the people to amend their state constitution by initiative is an integral part of Florida's lawmaking power, Amendment Six does not run afoul of the U.S. Constitution.

III.

The appellants also say that Amendment Six is unconstitutional for another reason: even assuming that the method of enactment does not run afoul of the Elections Clause, they argue that the substance of Amendment Six does. The claim is that Amendment Six imposes substantive criteria that go far beyond the state legislature's delegated power to prescribe the "Times, Places and Manner" of holding elections, which, the appellants argue, is limited to prescribing purely procedural matters. Thus, the appellants urge us to conclude that Amendment Six

21

would still be unlawful under the Elections Clause even if it had been enacted by the state legislature rather than by the people. Again, we are unpersuaded.

As an initial matter, it is debatable whether it is correct to characterize as "substantive" the standards imposed by Amendment Six. By substantive, the appellants really mean criteria that are designed to compel or dictate the outcome of a congressional election. But it's not at all clear that the six criteria found in Amendment Six are designed to determine the outcome of elections. Contiguity, compactness, respect for political and geographic boundaries, and population equality seem more fairly characterized as procedural in nature -- they deal strictly with the method of drawing district lines, without <u>any</u> regard for the particular outcome those lines may yield. The minority and incumbency provisions of Amendment Six are arguably closer to the substantive end of the spectrum, but even these criteria are not designed to compel electoral outcomes but rather, by their very terms, merely to level the playing field by ensuring equality among <u>all</u> voters and by increasing opportunities for <u>all</u> candidates.

More significantly, whether these factors are characterized as being substantive or procedural in nature is of little moment, because, however they are classified, Amendment Six does not exceed the scope of the Elections Clause power to regulate the manner of elections. The standards enumerated in

Amendment Six involve precisely the kinds of factors that legislative bodies have traditionally used in drawing congressional and local political boundary lines, and that courts have long ratified.

The Supreme Court has acknowledged the lawfulness of considering factors just like those included in Amendment Six. In Karcher v. Daggett, 462 U.S. 725 (1983), for example, the Court considered a challenge to congressional districts based on population variances. In that context, the Court observed that a state legislature drawing district lines may take into account what the Court termed "legitimate objectives," such as "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives," id. at 740, or, at issue in Karcher itself, preserving the voting strength of minorities, see id. at 739 (acknowledging that "state legislatures could pursue legitimate secondary objectives" such as "protect[ing] the interests of black voters," as long as the resulting districts did not involve impermissible population deviations). In the same opinion, the Court also observed that states may "tak[e] steps to inhibit gerrymandering, so long as a good-faith effort is made to achieve population equality as well." Id. at 734 n.6. In this context, the Court cited approvingly to a Colorado constitutional provision that imposes "guidelines as to compactness, contiguity, boundaries of political

23

subdivisions, and communities of interest." Id. (citing Colo. Const. art. V, § 47).

What's more, by our count, at least ten other states have adopted constitutional provisions mandating consideration of some or all of the factors found in Florida's Amendment Six. See Ariz. Const. art. IV, pt. 2, § 1(14)-(15) (requiring congressional districts to comply with the Voting Rights Act, and, to the extent practicable, to be compact, contiguous, and of equal population, and to respect communities of interest, political boundaries, and visible geographic features; favoring "competitive districts" where consistent with these other goals; and prohibiting the consideration of "[t]he places of residence of incumbents or candidates"); Cal. Const. art. XXI, § 2(d)-(e) (requiring districts to comply with the Voting Rights Act, to be contiguous, to respect political boundaries and communities of interest, and, to the extent practicable, to be compact; and prohibiting the consideration of incumbency or the favoring or disfavoring of any candidate or political party); Colo. Const. art. V, § 47 (requiring congressional districts to be contiguous and as compact as possible, to respect political boundaries, and, "wherever possible," to preserve "communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors"); Conn. Const. art. III, § 5 (requiring congressional districts to be "consistent with federal constitutional standards"); Iowa Const. art. III, § 37

24

(requiring congressional districts to be contiguous and to respect political boundaries); Mo. Const. art. III, § 45 (requiring congressional districts to be contiguous, compact, and as nearly equal in population as possible); Va. Const. art. II, § 6 (same); W. Va. Const. art. I, § 4 (same); Wash. Const. art. II, § 43(5) (requiring congressional districts to be as nearly equal in population as practicable, and, to the extent reasonable, to be contiguous, compact, and "convenient," and to respect natural and political boundaries; and prohibiting favoring or discriminating against any political party or group); Wyo. Const. art. III, § 49 (requiring congressional districts to be contiguous and compact, and to respect political boundaries).

In addition, at least six other states use statutes to impose standards for congressional redistricting. See Haw. Rev. Stat. § 25-2(b) (prohibiting congressional districts drawn "so as to unduly favor a person or political party"; and requiring districts, to the extent possible, to be contiguous, compact, and of equal population, to respect political boundaries, and to avoid "submergence of an area in a larger district wherein substantially different socio-economic interests predominate"); Idaho Code Ann. § 72-1506 (requiring congressional districts to be equal in population, to comply with all federal requirements, and, to the extent possible, to "preserve traditional neighborhoods and local communities of

25

interest," "avoid drawing districts that are oddly shaped," and respect political boundaries; and prohibiting counties from being divided to "protect a particular political party or a particular incumbent"); Me. Rev. Stat. tit. 21-A, § 1206 (requiring congressional districts to be compact, contiguous, and of equal population, and to respect political boundaries); Mich. Comp. Laws § 3.63 (establishing exclusive guidelines for congressional redistricting, which require districts to comply with the Voting Rights Act, to be "convenient," contiguous, compact, and of equal population, and to respect political boundaries); Mont. Code Ann. § 5-1-115 (prohibiting congressional districts drawn to favor a political party or incumbent, and forbidding the consideration of information such as incumbents' addresses or voters' party affiliations); Or. Rev. Stat. § 188.010 (requiring congressional districts, as nearly as practicable, to be contiguous and of equal population, and to respect geographic and political boundaries and communities of interest; and prohibiting districts drawn to favor a political party or incumbent or to dilute the voting strength of any language or ethnic minority).

Moreover, it must surely be appropriate for a state legislature to take into account the effect that its new districts will have on racial and language minorities. The federal Voting Rights Act prohibits voting practices that deny or abridge the right of any citizen to vote on account of membership in a racial or language

26

minority group. 42 U.S.C. § 1973(a). To argue that Florida may not consider a factor that it is otherwise obliged to consider under the Supremacy Clause has no persuasive force. Again, it is irrelevant that only five Florida counties are subject to the Voting Right Act's preclearance requirement. See supra note 10. More generally, if the appellants' argument were correct, then no state would be allowed to consider the effect of its congressional districts on minorities, even if the entire state were subject to Section 5 preclearance.

The fundamental problem with the appellants' argument is that it says too much and goes too far. If, as the appellants claim, the requirements of Amendment Six exceed the scope of the Elections Clause because they are substantive in nature, then even a state legislature would lack the power to enact a law imposing the very same requirements. But taking this argument to its logical conclusion would mean that no state legislature could decide to consider incumbency, compactness, contiguity, or any of the other Amendment Six factors. Under the appellants' reasoning, apparently there would be no clearly explicated factors that a state legislature could validly consider when redistricting. This is plainly wrong.

It is undisputed that states have the delegated power under the Elections Clause to create districts for congressional elections. See, e.g., 2 The Records of

the Federal Convention of 1787, at 240 (Max Farrand ed., rev. ed. 1974) (statement of James Madison) (explaining that the power to prescribe the times, places, and manner of holding elections includes determining "[w]hether the electors . . . should be divided into districts or all meet at one place").  Indeed, a federal statute requires states to use single-member districts rather than electing Representatives at large.  2 U.S.C. § 2c.  But if the appellants' argument were taken literally, the power to craft congressional districts would not include the power to consider any codified criteria when actually drawing those districts' lines.  A state legislature would be cut adrift, left with little or no guidance for grappling with the complex calculus involved in redrawing congressional boundaries -- a task which, in Florida, requires dividing a state of some nineteen million people spread over more than fifty thousand square miles into twenty-seven congressional districts.

In making the argument that the substance of Amendment Six runs afoul of the Elections Clause, the appellants rely on two Supreme Court cases -- U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779 (1995), and Cook v. Gralike, 531 U.S. 510 (2001). Neither case is on point.  First, in U.S. Term Limits, the Court invalidated an Arkansas constitutional amendment that prohibited anyone who had already served three terms in the House of Representatives or two terms in the Senate from

28

having his name appear on the ballot. 514 U.S. at 783. And then in Cook, the Court relied on U.S. Term Limits to invalidate a Missouri constitutional amendment that required disclaimers to be printed on the ballot next to the names of congressional candidates who did not take certain actions in support of term limits. Cook, 531 U.S. at 514-15. The Court concluded that these provisions could not be sustained under the Elections Clause, which does not authorize states "to dictate electoral outcomes, [or] to favor or disfavor a class of candidates." U.S. Term Limits, 514 U.S. at 833-34; Cook, 531 U.S. at 523, 525-26. The appellants suggest that Amendment Six is also an unconstitutional attempt to dictate outcomes and favor or disfavor candidates.

Given the nature of the provisions at issue in U.S. Term Limits and Cook, it is not surprising that the Court framed its holdings in terms of "dictat[ing] electoral outcomes." Both cases involved ballot requirements meant to prevent or severely cripple the election of particular candidates. The Court emphasized that these provisions were specifically designed to "handicap" certain candidates. Cook, 531 U.S. at 524-25 (observing that the Missouri amendment was "plainly designed to favor candidates" who support term limits and "disfavor" others, and that its "intended effect" was to "handicap" these disfavored candidates); U.S. Term Limits, 514 U.S. at 831 (observing that the "avowed purpose and obvious

29

effect" of the Arkansas amendment was to "handicap[] a class of candidates," namely, incumbents). It was this impermissible attempt to effectively "exclude classes of candidates from federal office" that exceeded the Elections Clause power reposed in state legislatures to regulate the "manner" of congressional elections. See U.S. Term Limits, 514 U.S. at 832-33.[10]

Amendment Six is profoundly different and easily distinguishable from the provisions outlawed in U.S. Term Limits and Cook. Unlike those two provisions, Amendment Six is not intended to handicap particular candidates. The appellants point to Amendment Six's minority and incumbency provisions, but neither unconstitutionally "dictate[s] electoral outcomes." Again, the minority provision contained in Amendment Six closely tracks long-standing federal requirements. Since the state already must comply with the provisions of the Voting Rights Act, it is hard to see how Amendment Six's minority provision could have an unlawful impact. And even setting aside the Voting Rights Act, Amendment Six's minority provision is not the kind of provision proscribed in U.S. Term Limits and Cook. Rather, the minority provision does no more than attempt to provide equal

---

[10] The appellants also suggest that U.S. Term Limits and Cook forbid any electoral regulation that "influences" electoral outcomes. These cases do not and could not stand for so sweeping a proposition. Indeed, any number of perfectly valid regulations might affect electoral outcomes. Thus, for example, merely setting a day and time for congressional elections will almost surely affect who goes to the polls, but it would be wholly unconvincing to say that such a regulation would exceed the state's Elections Clause power.

30

opportunity for insular classes of voters.

Amendment Six's incumbency provision is also consistent with the reasoning employed in U.S. Term Limits and Cook. The incumbency provision is neutral on its face, explicitly requiring that lines not be designed to help or handicap particular candidates based on incumbency or membership in a particular party. Far from "dictat[ing] electoral outcomes," the provision seeks to maximize electoral possibilities by leveling the playing field. Indeed, it would be extraordinary to conclude that a provision prohibiting district lines "drawn with the intent to favor or disfavor a political party or an incumbent" somehow violates a rule against electoral regulations that "favor or disfavor . . . candidates." Compare Fla. Const. art. III, § 20(a), with U.S. Term Limits, 514 U.S. at 834.

In short, Amendment Six does not exceed the scope of Florida's Elections Clause power to regulate the manner of congressional elections. All Amendment Six does is require the legislature to account for some particular standards when conducting the complex task of drawing congressional district lines. States can and routinely do consider the very same factors when redistricting, and codifying them in a constitutional amendment does not implicate the prohibition in U.S. Term Limits and Cook on regulations that "dictate electoral outcomes."

Amendment Six is entirely consistent with the Elections Clause, both as to

31

its substance and its manner of enactment. The district court's order granting

summary judgment to the appellees is, therefore, AFFIRMED.