[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14392
Non-Argument Calendar
_____

D.C. Docket No. 1:10-cv-02163-MHS


TIMOTHY CLARK,
MELISSA CLARK, Individually and in
her Capacity as Administrator of the Estate
of Montellis Clark, deceased,

                                                        Plaintiffs-Appellants,

versus

CITY OF ATLANTA, GEORGIA, et al.,

                                                        Defendants-Appellees.
_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 15, 2013)

Before MARCUS, JORDAN, and KRAVITCH, Circuit Judges.

PER CURIAM:

Timothy Clark, individually, and Melissa Clark, individually and as the administrator of the Estate of Montellis Clark, appeal the district court's grant of summary judgment to the City of Atlanta, former Chief of Police Richard Pennington, and Officers Gregory Dubose and Clarence Tosh on their civil rights complaint. For the reasons which follow, we affirm.

Mr. and Ms. Clark filed suit against the officers, the City of Atlanta, and former Chief Pennington asserting federal claims under 42 U.S.C. § 1983 for unreasonable search and seizure, excessive force, false arrest, failure to train and supervise, and under state law for trespass, battery, false arrest, false imprisonment, intentional infliction of emotional distress, negligence, and racketeering. At the summary judgment stage, the district court found that the officers were entitled to qualified immunity because they did not violate the Clarks' constitutional rights. Specifically, the district court determined that the officers were justified in conducting an investigatory stop because they had at least arguable reasonable suspicion that the Clarks might have been engaged, or were about to engage, in criminal activity. Additionally, the district court determined that the officers' use of deadly force was objectively reasonable under the circumstances. Moreover, because the officers did not violate the Clarks' constitutional rights, the district court held that the federal claims against the City of Atlanta and former Chief Pennington failed as a matter of law. Finally, the

2

district court concluded that the Clarks had abandoned their state law claims because they failed to respond to any of the arguments the defendants raised in their summary judgment motion.

# I

This case arises from a tragic series of events.  On July 15, 2008, Officers Dubose and Tosh were in an unmarked police vehicle patrolling an area of Atlanta that had recently been subject to a string of burglaries, including some targeting vacant homes.  The officers observed Ms. Clark and her two sons—Timothy and Montellis—outside of what appeared to be a vacant home that had no curtains and a lockbox on the door.[1]  The officers had concerns that the three individuals might be preparing to burglarize the home and decided to return to the property to investigate.

As the officers drove onto the property, they observed that Montellis Clark had his hands in his pockets, and as such, they decided to approach with their guns drawn.  The officers were wearing vests displaying the words "Atlanta Police," and one of them wore his badge around his neck.  They ordered Montellis Clark to remove his hands from his pockets.  Mr. and Ms. Clark told Montellis Clark to obey the officers' order, but he refused to comply.

---

[1] For ease of reference, we refer to Timothy Clark as Mr. Clark, and Montellis Clark by his full name.

3

Montellis Clark eventually pulled out a gun from his pocket and pointed it towards Officers Dubose and Tosh. The officers and Montellis Clark fired their guns.[2] According to Officer Tosh, he continued to fire his gun at Montellis Clark—who was now on the ground—because Montellis Clark had his gun in his right hand and continued to move it, despite Officer Tosh's commands not to move. The Clarks, however, dispute whether Montellis Clark continued to resist after he was on the ground. According to Ms. Clark, as outlined in unsworn statements, Montellis Clark was "already dead" or "down and unarmed" when Officer Tosh reloaded his gun and continued to shoot. *See* D.E. 1-1 at 1, 4; D.E. 57-2 at 5-6, 19.

Montellis Clark died from the gunshot wounds he received. Mr. Clark was shot in the back in the crossfire.[3] Officer Dubose received a gunshot wound to the face and Officer Tosh suffered a severe chest bruise from a gunshot that was partially stopped by his protective vest.

Shortly thereafter, additional officers from the Atlanta Police Department arrived on the scene and initially placed Mr. and Ms. Clark in handcuffs while they

---

[2] The parties disagree on who fired the first shot. We assume that Montellis Clark did not fire first, but our resolution of this case does not turn on that fact.

[3] Mr. and Ms. Clark maintain that the officers shot Mr. Clark, but the evidence is unclear as to whether Mr. Clark was struck by a bullet fired by one of the officers or Montellis Clark. That dispute, however, does not create a genuine issue of fact precluding summary judgment. We assume that one of the officers fired the bullet that struck Mr. Clark, but our resolution of the case does not turn on that disputed fact.

4

investigated the scene.  Ms. Clark was released once it was confirmed that she was not burglarizing the home or involved in the shooting.  Mr. Clark was taken to a nearby hospital for treatment.

It was later discovered that the Clarks had not engaged, and were not about to engage, in any criminal activity when Officers Dubose and Tosh first approached.  They had permission to be on the property, and were helping Ms. Clark's boyfriend remodel the vacant home.  And, although not known to the officers at the time, and possibly the reason this regrettable encounter escalated as it did, Montellis Clark suffered from paranoid schizophrenia and had been arrested multiple times for violent crimes, including aggravated assault.

## II

We exercise plenary review when reviewing a summary judgment order. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1274 (11th Cir. 2012) (citation and internal quotation marks omitted).

In deciding this case, we limit our review to the articulable arguments raised by Mr. and Ms. Clark on appeal. *See Arthur Pew Const. Co., Inc. v. Lipscomb*, 965

5

F.2d 1559, 1575 (11th Cir. 1992) ("[W]e will not consider issues not raised below and/or not raised on appeal . . . ."). Those arguments are as follows: (1) Officers Dubose and Tosh failed to argue qualified immunity in their motion for summary judgment; (2) the district court failed to address the individual claims of Mr. and Ms. Clark; (3) the district court incorrectly characterized the encounter as an investigatory stop, which requires reasonable suspicion, rather than as an arrest, which requires probable cause; and (4) the district court erred in granting summary judgment because there were disputed issues of material fact.

### III

Qualified immunity completely "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). To be entitled to qualified immunity, "the public official must show that he was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred." *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). An officer acts within the scope of his discretionary authority when his conduct is undertaken pursuant to the performance of his official duties. *Harbert Int'l, Inc. v. James*, 157 F.3d 1271,

6

1282 (11th Cir. 1998).  Here, it is undisputed that the officers were acting within the scope of their discretionary authority.  Thus, "the burden shifts to [Mr. and Ms. Clark] to show that qualified immunity is not appropriate."  *Lee*, 284 F.3d at 1194.

We apply a two-part test to determine whether qualified immunity is appropriate: (1) whether the facts as alleged show that the officer's conduct violated a constitutional right; and, if so, (2) whether such a right was clearly established at the time of the violation.  *Scott v. Harris*, 550 U.S. 372, 377 (2007).  In evaluating these two prongs, the "judges of the district courts and the courts of appeals . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  *See also Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) ("[D]iscussion of a constitutional violation may become unnecessary for qualified immunity purposes when the right was not clearly established.  It is therefore not mandated that the Court examine the potential constitutional violation under . . . step one prior to analyzing whether the right was clearly established under step two.") (citing *Pearson*, 555 U.S. at 236).  With these principles in mind, we turn to the arguments raised by Mr. and Ms. Clark on appeal.

## A

As an initial matter, the record contradicts Mr. and Ms. Clark's contention

that Officers Dubose and Tosh failed to make a qualified immunity argument in their motion for summary judgment.  Although we recognize that the officers' initial motion for summary judgment did not include a qualified immunity argument, they filed an amended motion for summary judgment that plainly did assert qualified immunity.  *See* D.E. 67-1.  This argument, therefore, lacks merit.

Mr. and Ms. Clark also argue that the district court did not address their individual claims.  We do not agree.  Mr. and Ms. Clark's individual claims are similar to the claims brought on behalf of the Estate of Montellis Clark and resulted from the same set of facts.  Thus, the Clarks' individual claims and the claims of the Estate were properly disposed of by the district court as part of the same analysis.

**B**

Mr. and Ms. Clark argue on appeal that the district court erred in using "reasonable suspicion" as the standard for determining whether the officers should enjoy qualified immunity.  According to the Clarks, the district court should have determined whether the officers had probable cause to detain them.  We disagree.

The Supreme Court has held that an officer may not only stop, but also conduct a limited detention of someone whom the officer reasonably suspects may pose a threat of criminal activity, in order "to dispel [the officer's] reasonable fear for his own or others' safety . . . ."  *Terry v. Ohio*, 392 U.S. 1, 30, (1968).  The

8

interest of "effective crime prevention and detection," the Court explained, "underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22. As such, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). This standard applies to "'any curtailment of a person's liberty by the police.'" *Jackson v. Sauls*, 206 F.3d 1156, 1166 n.12 (11th Cir. 2000) (quoting *Reid v. Georgia*, 448 U.S. 438, 440 (1980)).

We note that, "[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The question is whether "the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (quoting *Terry*, 392 U.S. at 22).

9

"Reasonable suspicion is determined from the totality of circumstances and collective knowledge of the officers." *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006). Of particular importance here, "[w]hen an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had arguable reasonable suspicion to support an investigatory stop." *Jackson*, 206 F.3d at 1165-66 (citations and internal quotation marks omitted). Thus, an officer "who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." *Id.* at 1166.

Our inquiry begins by determining when the officers detained the Clarks. *See id*. We agree with the district court that the record, viewed in the light most favorable to the Clarks, shows that the seizure occurred when the officers got out of their car with their guns drawn and ordered Montellis Clark to take his hands out of his pocket. *See id.* ("It is only when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'") (quoting *Terry*, 392 U.S. at 19 n.16).

We next address whether there was arguable reasonable suspicion for the seizure, that is, whether "the totality of the circumstances create[d], at least, some minimal level of objective justification for the belief that the [Clarks] [were] engaged in unlawful conduct." *Blackman*, 66 F.3d at 1576. The undisputed evidence shows that, at the moment of the seizure, the officers were aware that

10

there had been a rash of burglaries in the area, that vacant properties were often targeted for burglaries, and that the property where the Clarks were standing appeared to be vacant. Accordingly, based on the totality of the circumstances, the district court correctly found that the officers had at least arguable reasonable suspicion that the Clarks might have been engaged or were about to engage in criminal activity.

Finally, we consider whether the investigatory stop matured into an arrest. The determination of "whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances." *Blackman*, 66 F.3d at 1576 (citation omitted). Mr. and Ms. Clark contend that the district court erred in finding that the investigatory stop did not mature into an arrest where the officers brandished their weapons as they exited their car. We have, however, said many times before that "the fact that police . . . draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest." *Id.* (citing *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985), and *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)). *See also United States v. Roper*, 702 F.2d 984, 987 (11th Cir. 1983) ("an officer's display of weapons does not necessarily convert an investigatory stop into an arrest").

11

We agree with the district court that given the officers' arguable reasonable suspicion that the Clarks might have been engaged, or were about to engage, in criminal activity, and that Montellis Clark was standing with his hands in his pockets, it was reasonable for the officers to believe that Montellis Clark might have been carrying a weapon. The officers, therefore, were justified in exiting their car with their weapons drawn for their own protection until they could determine whether Montellis Clark posed a threat to them or anyone else. *See United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983) ("The use of a gun in connection with a stop is permissible when the officer reasonably believes it is necessary for his protection."). As a result, the officers' actions in drawing their guns did not turn the investigatory stop into an arrest. *See Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991) ("the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest, and . . . police may take reasonable action, based on the circumstances, to protect themselves").

In short, the district court correctly determined that because the officers had arguable reasonable suspicion of possible criminal activity, they were justified in coming onto the property with their guns drawn to make an investigatory stop in order to determine whether or not the Clarks were engaging in or about to engage in criminal activity. *Cf. United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir.

12

1991) ("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants."). Accordingly, the officers did not violate the Clarks' Fourth Amendment rights in conducting the stop.

## C

Mr. and Ms. Clark also argue on appeal that there was no need for them to respond to the defendants' motion for summary judgment on the § 1983 excessive force and state law claims because the defendants' contentions did not support the entry of summary judgment. We, however, agree with the district court's determination that in failing to respond to the defendants' arguments, Mr. and Ms. Clark abandoned their excessive force and state law claims. "In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citation and internal quotation marks omitted). As such, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Id.* (citation omitted). Instead, "the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.* (citations omitted). The district court, therefore, properly treated as abandoned the Clarks' excessive force and state law claims, which were alleged

13

in the complaint, but not addressed in opposition to the motion for summary judgment.[4]   For that reason, and because the Clarks have not even on appeal responded to the defendants' arguments regarding the state law claims, we decline to generally address those claims.  *Cf. Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) ("It could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.  Moreover, on appeal the union has not raised as an issue the refusal of the district court to consider the alter ego claim. The district court's refusal could not, therefore, be considered as an issue on appeal.").  We only consider the excessive force claims because Mr. and Ms. Clark seemingly argue on appeal, though only marginally, that the officers acted unreasonably in deploying their weapons.

The Supreme Court has ruled that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under" a reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). We have previously said that the "[r]easonableness [of the officer's actions] is dependent on all the circumstances that are relevant to the officer's decision to use

---

[4]   Even though the district court determined that the Clarks abandoned their excessive force claims, it nevertheless analyzed those claims and found that the officers were entitled to qualified immunity because their use of deadly force was reasonable under the circumstances.

14

deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (citing *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010)). Those circumstances must be viewed from the perspective of the law enforcement officer on the scene, *id.*, rather than "with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396.

The Supreme Court has also explained that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Furthermore, we have said that "[b]ecause the Constitution permits the use of deadly force to prevent a violent suspect from escaping, the Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003). To be entitled to qualified immunity, "an officer need only have arguable probable cause" to employ deadly force. *See St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002). Indeed, we recently held that an officer was entitled to qualified immunity because his use of deadly force was

15

objectively reasonable given that the plaintiff posed a threat of serious physical injury to the officer and to others in the surrounding residential area. *See Jean-Baptiste*, 627 F.3d at 821. We noted that "[r]egardless of whether [the plaintiff] had drawn his gun, [his] gun was available for ready use, and [the officer] was not required to wait 'and hope[ ] for the best.'" *Id.* (quoting *Scott*, 550 U.S. at 385).

At the time of shooting here, the officers knew they were in a residential area that had been targeted for burglaries; they found it suspicious that the Clarks were just standing in the yard of what appeared to be a vacant home; Montellis Clark refused the officers' commands and his family's requests to remove his hands from his pocket; and when he did take out his hands, he had a gun. Under those circumstances, the officers had arguable probable cause to deploy their weapons as they reasonably perceived that Montellis Clark posed an immediate threat of serious harm to them and to any other individuals in the surrounding area. *See id.*

Mr. and Ms. Clark argue that summary judgment was improper, however, because there is an issue of fact as to whether Montellis Clark or the officers fired first. That disputed fact is immaterial because Mr. and Ms. Clark admit that Montellis Clark drew his weapon before the officers started shooting. Under such circumstances, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."

16

*Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). Taking the Clarks' version that the officers fired first as true, from the perspective of a reasonable officer on the scene, the officers' use of force in firing at Montellis Clark once he pulled out a gun was objectively reasonable under the circumstances. *See Jean-Baptiste*, 627 F.3d at 821 (excessive force was reasonable where officer saw suspect holding a gun standing eight to ten feet away from him, and officer fired fourteen times at the suspect); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167-68 (11th Cir. 2009) (officers' use of deadly force was justified where suspect refused to obey officers' commands and instead pointed a gun at the officers).

Mr. and Ms. Clark also argue that Officer Tosh's actions in continuing to shoot at Montellis Clark after he was down on the ground were excessive and unreasonable. A police officer, however, is entitled to continue his use of force until a suspect thought to be armed is "fully secured." *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (holding that an officer acted reasonably by using the force exerted by a police canine to detain a suspect who was believed to be armed until the suspect could be handcuffed). The record shows that Officer Tosh continued to fire his weapon in response to Montellis Clark moving the hand in which he had his weapon—despite Officer Tosh's commands to stop moving.[5]

---

[5] According to Ms. Clark, Montellis Clark was "already dead" or "down and unarmed" when Officer Tosh reloaded his gun and continued shooting. *See* D.E. 1-1 at 1, 4; D.E. 57-2 at 5-6, 19. Those assertions, however, were made in unsworn statements (i.e., a statement provided

17

Given that both officers had already sustained gunshot wounds as a result of their altercation with Montellis Clark, the law did not require Officer Tosh to wait for Montellis Clark to fire at him again before he could react to protect himself. *See Long*, 508 F.3d at 581. In sum, Officer Tosh acted reasonably in continuing to shoot at Montellis Clark until the threat of serious physical harm was eliminated and Montellis Clark was fully secured. *See Jean-Baptiste*, 627 F.3d at 821 ("Until Officer Gutierrez verified that Jean–Baptiste was disarmed, Officer Gutierrez had 'no reason to trust that [Jean–Baptiste] would not suddenly attempt to do him harm.'") (quoting *Crenshaw*, 556 F.3d at 1293).

In summation, the district court properly concluded that the officers acted reasonably under the circumstances and did not violate the Clarks' constitutional rights. Because we find no constitutional violation, we need not reach the clearly established prong of the qualified immunity analysis. *See Pearson*, 555 U.S. at 236; *Lewis*, 561 F.3d at 1291.

**D**

---

to the Atlanta Police Department's Office of Professional Standards, a statement provided to the City along with her claim, and a statement given to police), which "'do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e)[] and cannot be considered by a district court in ruling on a summary judgment motion." *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970)). Thus, "[b]ecause . . . [Ms. Clark's statements] w[ere] submitted without attestation, [they] had no probative value and properly w[ere] not considered by the district judge in ruling on the officers' summary judgment motion[]." *Id.* Accordingly, the district court properly deemed as undisputed Officer Tosh's testimony that Montellis Clark was still moving and threatening him with his weapon even after he was down.

18

In the absence of a constitutional violation by Officers Dubose and Tosh, the claims of Mr. and Ms. Clark against former Chief of Police Pennington and the City of Atlanta must fail. Because the officers did not violate the Clarks' constitutional rights, there is no basis for municipal liability under § 1983. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred.").

The claims of Mr. and Ms. Clark against former Chief Pennington in his individual capacity also fail because there is no evidence that he had any personal involvement in the alleged unconstitutional conduct. Nor is there any evidence of widespread abuse that put former Chief Pennington on notice of a purported need to correct alleged constitutional deprivations and he failed to do so. *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) ("Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the

19

responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.") (citation and internal quotation marks omitted).

## IV

For the foregoing reasons, we affirm the district court's grant of summary judgment.

**AFFIRMED**.