[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12407
Non-Argument Calendar

_____

D.C. Docket No. 3:15-cv-01277-AKK

TIFFANY BECKMAN,
as the personal representative of the estate of Mitchell Campbell,

Plaintiff - Appellant,

versus

JOE HAMILTON,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(April 23, 2018)

Before WILLIAM PRYOR, ANDERSON, and EDMONDSON, Circuit Judges.

PER CURIAM:

Plaintiff Tiffany Beckman -- as the personal representative of the estate of Mitchell Campbell -- appeals the district court's grant of summary judgment in favor of Defendant Lauderdale County Deputy Sheriff Joe Hamilton in Plaintiff's 42 U.S.C. § 1983 civil action. This action is about an active-shooter suspect shot dead and alleged excessive force in violation of the Fourth and Fourteenth Amendments. No reversible error has been shown; we affirm.

This case arises from the fatal shooting of Campbell. On the evening of 10 August 2013, Deputy Hamilton and three other officers responded to a 911 call. The dispatch operator told Deputy Hamilton that the 911 caller (Andrea Whitaker) had reported that her neighbor (Campbell) (1) was highly intoxicated,[1] (2) owned several guns, (3) was yelling and threatening to kill the Whitaker family, (4) was shooting repeatedly at the Whitaker home, and (5) had already struck the Whitaker home with a bullet.

When officers arrived at the Whitaker home, two members of the Whitaker family were hiding behind cars and warned the officers to take cover because Campbell was shooting in their direction. The officers could hear Campbell -- who

---

[1] Plaintiff, Campbell's common law wife, was inside the couple's home on the night of the shooting. Plaintiff says Campbell had been drinking that night but that Campbell was not slurring his speech and did not appear to her to be intoxicated. At the time of his death, Campbell had a blood alcohol level of .335 grams per 100 milliliters and also had traces of hydrocodone and marijuana in his system.

was standing on the porch of his mobile home about 150 feet away -- yelling and cussing. The officers also heard shots whizzing through the trees and believed Campbell was firing in the direction of the Whitaker home.

The Whitakers reported to the officers that Campbell had threatened to kill them and had been shooting at their house. After deciding to arrest Campbell, the officers approached Campbell's home on foot "under cover of darkness," walking from the road up Campbell's long driveway. Out of concern for officer safety, the officers attempted to avoid being seen by Campbell as they approached Campbell's home.

When the officers were about halfway up the driveway, they saw Campbell standing on his porch holding a "long gun." The officers saw and heard Campbell fire 6 to 10 rounds in rapid succession in the direction of the Whitaker home. The officers also heard Campbell yell something like "I'll kill ya'll." The officers continued their approach and hid behind a corner of Campbell's home. Meanwhile, Campbell continued to yell and cuss on and off and had loud music playing at this time. It appeared to the officers then that Campbell was unaware of their presence.

Shortly after reaching the house, Deputy Hamilton saw that Campbell had come down onto the porch steps and appeared unarmed. Deputy Hamilton and Deputy Brown -- who were both in full uniform -- then stepped out from behind

3

the mobile home.  The officers did not proclaim their presence.[2]  Deputy Hamilton

stepped toward Campbell with his gun drawn.  Campbell then turned away from

Deputy Hamilton, "stumbled" up a couple of steps onto the porch and bent down.[3]

Deputy Hamilton -- who was then at or near the bottom of the porch steps -- saw

Campbell pick up a gun and then saw the barrel of the gun come up and then fall

so that it appeared to be pointing at Deputy Hamilton.  For purposes of this appeal,

---

[2] This supposed fact is disputed.  Deputies Hamilton and Brown each contend that they yelled "Sheriff's Office" loudly a couple of times.  The other two officers on the scene and the Whitakers also reported that they heard the officers announce themselves.  Plaintiff -- who was inside the mobile home at the pertinent time -- says she did not hear anyone yell "Sheriff's Office."  Plaintiff concedes it was difficult to hear what was being said outside given the loud music and the sound of the air conditioner, but says she would have heard if someone had shouted "Sheriff's Office."  For purposes of this appeal, we must view the facts in the light most favorable to Plaintiff and will assume that the officers did not announce themselves.

[3] In response to Deputy Hamilton's motion for summary judgment, Plaintiff argued that Campbell would have been unable to move up and down the porch steps given both his level of intoxication and that Campbell had sustained a recent knee injury and was in a full leg brace.  The district court refused to accept Plaintiff's assertion: unsupported by competent evidence.  In particular, the district court relied on Plaintiff's testimony that Campbell did not appear to her to be intoxicated and on Plaintiff's testimony about the level of physical activity Campbell had engaged in earlier in the day.
    Deputy Hamilton testified expressly that, when he stepped out from behind the house, Campbell was outside the gate that separated the porch from the porch steps and was at least two steps down from the porch.  Plaintiff does not purport to have witnessed the pertinent events.  Nor does Plaintiff dispute that Campbell was in fact able physically to move up and down stairs: Plaintiff testified only that Campbell had to do so "carefully" given his knee injury.  Because Plaintiff's speculative, non-expert opinion about Campbell's inability to use the stairs at the time of the shooting is both inconsistent with her other testimony about Campbell's physical condition that day and fails to contradict directly Deputy Hamilton's sworn testimony (including that Campbell "stumbled" up a couple of steps), Plaintiff has created no genuine issue of fact.  The district court committed no error in rejecting Plaintiff's subjective belief about Campbell's ability to move up and down the porch steps.  For background see Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002).

4

we will assume that Campbell's gun was not in fact aimed at Deputy Hamilton.[4] Deputy Hamilton -- believing Campbell was about to shoot him -- fired three rounds in rapid succession, striking Campbell in the arm and chest.

Campbell stood for a moment, dropped his gun, and then fell. Deputy Jones heard Campbell say something like "You startled me, You scared me, or Surprised me." About 2 to 4 seconds had elapsed from the time Deputies Hamilton and Brown came around the corner of the house to the time Campbell was shot. After the shooting, Deputy Hamilton asked Deputy Brown whether Campbell had a gun, to which Deputy Brown replied "of course, yes." When Plaintiff opened the door to the porch shortly after the shooting, she heard Deputy Hamilton say "oh s--t." Campbell died of his wounds.

Plaintiff filed this civil action against Deputy Hamilton individually, alleging that Deputy Hamilton used excessive force, in violation of the Fourth Amendment, when he shot Campbell. The district court granted Deputy

---

[4] Deputies Hamilton and Brown each testified that Campbell aimed his gun at Deputy Hamilton before Campbell was shot. Plaintiff's ballistics expert opined that, based on the forensic evidence, he did not believe Campbell was pointing a gun at Deputy Hamilton at the time Campbell was shot. The ballistics expert also said "I can't say whether he had a gun or whether he didn't have a gun or whether he was pointing it or not pointing it or whether he was using it as a crutch. I have no way of knowing that." The expert then reiterated his opinion that Campbell was pointing no gun at Deputy Hamilton when he was shot.

On this record, we are doubtful that the ballistics expert's testimony, in a legal sense, is sufficient to rebut the Deputies' direct testimony about the pointing of the gun. But (even if we accept as true Plaintiff's version of the facts) the manner in which Campbell was pointing the gun when he was shot is not dispositive. Our decision is the same whether Campbell -- when Deputy Hamilton made the decision to use deadly force -- was in fact pointing a gun at Deputy Hamilton, was in the process of doing so, or could be perceived reasonably as being in a position to do so speedily.

5

Hamilton's motion for summary judgment: a motion based on an assertion of qualified immunity. The district court concluded that no constitutional violation occurred.

We review de novo a district court's grant of summary judgment, viewing the evidence and all reasonable factual inferences in the light most favorable to the nonmoving party. Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007).

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation omitted). To avoid summary judgment based on qualified immunity, Plaintiff must show both that Deputy Hamilton violated a federal right and that the right was already clearly established -- given the circumstances surrounding Hamilton -- when Deputy Hamilton acted. See id. "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011).

A federal right is "clearly established" when "the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Id. at 2083 (quotations and alteration omitted); see also Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir.

6

1997) (en banc) ("For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law.").  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (emphasis added); see also City & County of San Francisco, Ca. v. Sheehan, 135 S. Ct. 1765, 1774 (2015); Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014); Stanton v. Sims, 134 S. Ct. 3, 5 (2013); al-Kidd, 131 S. Ct. at 2084.  "A plaintiff cannot rely on general, conclusory allegations or broad legal truisms" to show that a right is clearly established.  Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) (quotations omitted).

"Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand."  Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) (quotation omitted).  No precise or "rigid preconditions" exist for determining when an officer's use of deadly force is excessive.  See Scott v. Harris, 127 S. Ct. 1769, 1777 (2007).  Instead, in deciding the merits of a claim of excessive force, the court must in each case determine whether -- given all the facts and circumstances of a particular case -- the force used was "reasonable" under the Fourth Amendment.  Graham v.

7

Connor, 109 S. Ct. 1865, 1871-72 (1989); see also Long v. Slaton, 508 F.3d 576, 580 (11th Cir. 2007) ("Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, we must slosh our way through the factbound morass of reasonableness." (quotations, alterations, and citations omitted)).

"In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009).  We consider, among other things, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 109 S. Ct. at 1872.

We stress that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id.  And we must allow "for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Id.  "We are loath to second-guess the

8

decisions made by police officers in the field." Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003).

The evidence, viewed in the light most favorable to Plaintiff/Campbell, shows that Deputy Hamilton violated no constitutional right when he shot Campbell; Deputy Hamilton's conduct was objectively reasonable under the circumstances. Deputy Hamilton had been told that Campbell was heavily intoxicated, had threatened verbally to kill the Whitakers, was in possession of several guns, was shooting actively at the Whitaker home which was occupied, and had fired at least one shot that had already struck the Whitaker home. Later, Deputy Hamilton and the other officers on the scene also observed Campbell yelling, threatening to kill the Whitakers, and shooting repeatedly in the direction of the Whitaker home.

Under the circumstances, probable cause existed to suspect Campbell of having committed or of attempting to commit a serious offense. Then, immediately after Deputies Hamilton and Brown -- both in full uniform and Deputy Hamilton with his gun drawn -- stepped into view, Campbell retreated to his porch and grabbed a gun. At that point, an objective officer in Deputy Hamilton's position could have believed reasonably that Campbell was not only attempting to evade arrest but that Campbell posed an immediate threat to the safety of the officers. Faced with a "tense, uncertain, and rapidly evolving"

9

situation, Deputy Hamilton made a split-second decision to shoot Campbell to avoid the risk of serious injury.

Plaintiff argues that Deputy Hamilton acted unreasonably by not announcing himself and by taking Campbell by surprise. First, in the light of Campbell's erratic and violent conduct and his intoxicated state, an objectively reasonable officer could have concluded it was necessary -- for officer safety -- to approach Campbell cautiously and without being seen or heard. We have recognized that "[s]hock and surprise may be proper and useful tools in avoiding unnecessary injury to everyone involved when dealing with potentially violent suspects." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1245 (11th Cir. 2003); cf. Catlin v. City of Wheaton, 574 F.3d 361, 368 (7th Cir. 2009) (plainclothes officers acted reasonably in taking suspect by surprise and in throwing him to the ground without first identifying themselves because the officers believed (albeit mistakenly) that the suspect was armed and likely to resist arrest and, thus, "that they needed to use the element of surprise to their advantage" to minimize the risk of serious injury). In the light of the circumstances, that Campbell may have been surprised by Deputy Hamilton's presence at Campbell's house does not render the use of deadly force unreasonable, particularly given that Campbell immediately got a gun.

10

Further, even if the officers failed to declare themselves verbally, that both Deputies Hamilton and Brown were in full uniform when they stepped into view from behind Campbell's home is undisputed.  In the light of all the surrounding circumstances -- including the officers' dress and that, upon the officers' arrival, Campbell acted by turning and retreating to the porch -- an objectively reasonable officer in Deputy Hamilton's position could have believed that Campbell was in fact aware of the officers' presence.  Cf. Thomas v. Durastanti, 607 F.3d 655, 667 (10th Cir. 2010) (concluding a plainclothes officer's failure to identify himself was reasonable under the circumstances, where a state trooper's marked patrol car, with its emergency lights on, was also at the scene and where the suspects appeared to comply initially with the trooper's order to get back in the car).

In support of her contention that Campbell was shot while still unaware of the officers' presence, Plaintiff also relies on Campbell's utterance about being "startled," "scared," or "surprised."  Campbell's utterance, however, is not inconsistent with Deputy Hamilton's testimony and creates no genuine issue of fact about whether Campbell saw the officers before he was shot.  Besides, whether Campbell was meaningfully aware of the police before he was shot is not by itself critically important in this case, considering all the circumstances.

In the light of the rapidly evolving circumstances -- only 2 to 4 seconds having elapsed from when Deputies Hamilton and Brown stepped out from around

11

the house to when Campbell was shot -- we cannot say it was constitutionally unreasonable for Deputy Hamilton to use deadly force without first identifying himself verbally or issuing a verbal warning that deadly force would be used.  See Carr v. Tatangelo, 338 F.3d 1259, 1269, 1272-73 (11th Cir. 2003) (affirming the grant of qualified immunity where officers -- without having identified themselves, without having made themselves visible, and without having issued a force warning -- shot suspect who the officers believed reasonably, but mistakenly, was pointing a gun in the officers' direction and was chambering a bullet); see also Molina-Gomes v. Welinski, 676 F.3d 1149, 1153 (8th Cir. 2012) (affirming the grant of qualified immunity in a police shooting case, explaining that an undercover officer's use of force was constitutional -- even if the officers failed to identify themselves -- "given the fast evolving circumstances and the officers' reasonable belief that [the suspect] posed a serious threat to others.").

Plaintiff also contends that Deputy Hamilton's use of deadly force was unreasonable given that Campbell's gun was not aimed at Deputy Hamilton when Campbell was shot.  Plaintiff does not dispute, however, that Campbell was holding a gun when he was shot -- a gun that Deputy Hamilton says Campbell retrieved immediately after Deputies Hamilton and Brown stepped into view. Given that Campbell had been actively shooting at the Whitaker home (a home with people in and around it) moments before, had expressly threatened to kill

12

people, and had again armed himself, an objective officer under the circumstances could have believed reasonably that Campbell posed a threat of imminent danger even if Campbell's gun was not already aimed at Deputy Hamilton. Cf. Jean-Baptiste, 627 F.3d at 821 ("Regardless of whether Jean-Baptiste had drawn his gun, Jean-Baptiste's gun was available for ready use, and [the officer] was not required to wait 'and hope[] for the best.'"). "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007) (concluding the use of deadly force was reasonable, even though other less-lethal means of preventing the suspect's escape may have existed).

The reasonableness of force used is not judged "with 20/20 vision of hindsight." See Graham, 109 S. Ct. at 1872. In this case, because an objective policeman in Deputy Hamilton's place could have believed reasonably that Campbell (who was armed) was aiming -- or in the process of aiming -- a gun toward him, Deputy Hamilton is entitled to qualified immunity even if mistaken. See Penley v. Weippert, 605 F.3d 843, 851, 854 (11th Cir. 2010) (concluding that no Fourth Amendment violation occurred when officer believed reasonably that the suspect -- who was armed with a realistic-looking toy gun -- posed a threat of serious physical harm to the officers and to nearby students); Garczynski v. Bradshaw, 573 F.3d 1158, 1167 (11th Cir. 2009) (concluding officer was entitled

13

to qualified immunity when decision to shoot suspect was based in part on a mistaken, but reasonable, belief that the suspect was about to drive away).

In the light of the circumstances, Deputy Hamilton's use of deadly force was reasonable in the Fourth Amendment sense: no constitutional violation. Cf. Jean-Baptiste, 627 F.3d at 821 (officer's use of deadly force without warning was constitutionally reasonable when a suspect of violent crimes who had attempted to flee confronted the officer while suspect was holding a gun). In addition, we conclude separately that the law was not clearly established at the time of the shooting in 2013 that Deputy Hamilton's act (given the circumstances) violated federal law.[5] Deputy Hamilton is personally entitled to immunity.

AFFIRMED.

---

[5] Because the Constitution allows reasonable force and prohibits only unreasonable force, the question of unconstitutional force is a fact-sensitive one, given all the circumstances. In such a fact-sensitive approach, predicting in advance the outcome in particular cases is very often difficult because so many different factors must be weighed in the balance. Slight differences in circumstances can be important, making somewhat similar cases have different results. Furthermore, Plaintiff has cited no cases -- and we have found none -- that have decided that an officer acted unconstitutionally unreasonably when he used deadly force against a free suspect who -- in a short time before the shooting of the suspect -- had shot repeatedly toward a building with several inhabitants, who had threatened verbally to kill more than one person, and who still had a gun in hand when he was shot.

14